**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE ELETROBRAS SECURITIES LITIGATION

Case No.: 15-cv-5754-JGK

JURY TRIAL DEMANDED

# CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

## TABLE OF CONTENTS


I. PRELIMINARY STATEMENT .....1

II. JURISDICTION AND VENUE .....7

III. PARTIES .....7

A. Plaintiffs .....7

B. Defendants .....8

IV. FACTS RELEVANT TO THE CLAIMS .....12

A. Company Background .....12

B. Eletrobras' Involvement in an Extensive Bribery and Bid-Rigging Scheme .....14

C. Defendants Used Capital Projects to Improperly Divert Funds .....14

1. Angra 3 Thermonuclear Reactor .....15

2. Belo Monte Hydroelectric Dam .....16

3. Jirau Hydroelectric Dam .....18

4. Santo Antonio Hydroelectric Dam .....19

5. Teles Pires Hydroelectric Dam .....20

V. DEFENDANTS PUBLICLY MISREPRESENTED AND CONCEALED THEIR VIOLATIONS OF THE COMPANY'S CORPORATE ETHICS AND GOVERNANCE DIRECTIVES .....21

VI. DEFENDANTS MISREPRESENTED AND FAILED TO FULLY DISCLOSE THE MATERIAL DEFICIENCIES IN THE COMPANY'S INTERNAL CONTROLS .....31

VII. DEFENDANTS MISREPRESENTED AND FAILED TO DISCLOSE THAT KEY FINANCIAL METRICS IN THE COMPANY'S FINANCIAL STATEMENTS WERE MATERIALLY FALSE AND MISLEADING .....38

A. Applicable International Financial Reporting Standards .....39

B. The Company Materially Overstated PP&E And Correspondingly Misstated Earnings Throughout the Class Period .....42

1. Statements Concerning 2009 Earnings and PP&E .....42

2. Statements Concerning 2010 Earnings and PP&E .....44

3. Statements Concerning 2011 Earnings and PP&E ............................................45

4. Statements Concerning 2012 Earnings and PP&E ............................................46

5. Statements Concerning 2013 Earnings and PP&E ............................................48

6. Statements Concerning 2014 Earnings and PP&E ............................................49

C. Eletrobras Understated And Improperly Accounted For Certain Expenses ...............49

D. Eletrobras Failed to Timely Recognize Losses From SPEs......................................54

1. Madeira Energia S.A. (“MESA”) ......................................................................54

2. Norte Energia, S.A. ...........................................................................................57

3. Energia Sustentavel do Brasil S.A. (“ESBR”) ...................................................59

E. Eletrobras Misrepresented and Failed to Properly Disclose Related-Party Transactions.........................................................................................................60

VIII. DEFENDANTS MISREPRESENTED AND FAILED TO DISCLOSE THE SCHEME’S IMPACT ON CERTAIN CONSTRUCTION COSTS AND DEVELOPMENTS ..........................................................................................61

IX. ADDITIONAL FACTS SUPPORTING AN INFERENCE OF SCIENTER..................69

A. The Bribery Scheme Reached the Highest Levels of Executives at Eletrobras, Supporting an Inference of Corporate Scienter .......................................................69

1. Angra 3 and Eletronuclear...................................................................................70

2. Belo Monte and Eletronorte ...............................................................................72

B. The Scope of the Company’s Relationships With Indicted Construction Companies Supports An Inference of Corporate Scienter ........................................73

C. Eletrobras’ Debt Offering Supports an Inference of Scienter ...................................75

X. THE TRUTH IS REVEALED IN A SERIES OF PARTIAL DISCLOSURES..............77

A. October 27, 2014 Disclosure Event..........................................................................79

B. November 2014 Disclosure Events ..........................................................................79

C. February 10, 2015 Disclosure Event ........................................................................80

D. February 28, 2015 and March 2015 Disclosure Events............................................81

E. April 30 & May 13, 2015 Disclosure Events....82

F. June 25, 2015 Disclosure Event....85

G. Post-Class Period Disclosure Events....85

XI. FRAUD ON THE MARKET....86

XII. NO SAFE HARBOR....87

XIII. COUNT I: For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against Defendants Eletrobras, Lopes, Carvalho, and Araújo....88

XIV. COUNT II: For Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) & (c) Against All Defendants....89

XV. COUNT III: For Violation of Section 20(a) of the Exchange Act Against the Insider Defendants....90

XVI. PRAYER FOR RELIEF....91

XVII. JURY DEMAND....91

1. The City of Providence, Rhode Island and Dominique Lavoie ("Plaintiffs"), by and through their undersigned counsel, on behalf of themselves and all others similarly situated, allege the following based upon the investigation by Plaintiffs' counsel, except as to allegations specifically pertaining to Plaintiffs, which are based on personal knowledge. The investigation by counsel included, among other things: (i) review and analysis of the public filings with the U.S. Securities and Exchange Commission ("SEC") by Centrais Elétricas Brasileiras SA ("Eletrobras" or the "Company"); (ii) review and analysis of corporate press releases, disclosures and media reports issued and disseminated by Eletrobras; (iii) review of other publicly available information concerning Eletrobras, including transcripts of public investor presentations and conference calls; (iv) consultation with experts; and (v) review and analysis of the trading data relating to the price and volume of Eletrobras securities, including its American Depositary Shares ("ADSs") and bonds. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. PRELIMINARY STATEMENT

2. This is a securities class action brought under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a); and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 against Eletrobras and certain of its most senior executives (the "Action"). The Action is brought on behalf of a class consisting of all persons who purchased the U.S. exchange-traded securities of Eletrobras between August 17, 2010 and June 24, 2015, inclusive (the "Class Period").

3. This action arises from a massive bribery and corruption scheme that has reached the highest levels of the Company as well as the Brazilian government. Eletrobras' participation in this bribery and money laundering conspiracy lined the pockets of the Company's high ranking

senior executives and its subsidiaries, as well as political parties aligned with Brazilian President Dilma Rousseff.[1] Unbeknownst to Plaintiffs, money being paid by the Company to third parties, ostensibly for construction and services contracts, was being diverted to Eletrobras' executives and to political parties associated with the Company's management.

4. In an effort to conceal the nature and extent of these improper payments, Eletrobras improperly capitalized the payments as costs related to the construction and completion of its utility projects, recording them as part of the value of the Company's assets on its balance sheet. Accordingly, Eletrobras' publicly-released financial statements, including the value of its assets and its net income, were false and misleading at all relevant times. Further, rather than operate transparently and condemn any form of bribery and corruption as mandated by the Company's own "Code of Ethics," Eletrobras' massive corruption scheme benefitted its top executives and political parties at the expense of the Company's shareholders and investors.

5. As a result of Defendants' kickback and bribery scheme, on October 27, 2011 Defendants successfully consummated a large long-term debt offering worth over $1.75 billion. This offering enabled Defendants to fund construction projects in furtherance of the bribery scheme.

6. In March 2014, a Brazilian criminal money laundering investigation dubbed "Operação Lava Jato" or "Operation Car Wash," became public with the revelation that Brazilian prosecutors had discovered evidence that as many as 16 construction companies had driven up the costs of contracts with the state-run oil company, Petróleo Brasileiro S.A. ("Petrobras"), to cover bribes they were paying to Petrobras executives and politicians in exchange for the award of the

---

[1] On December 2, 2015, the Brazilian Congress initiated impeachment proceedings against President Rousseff due, in large part, to the corruption and kickback scheme.

overvalued contracts. Operation Car Wash has led to the arrests of more than 100 individuals in Brazil, many of whom are executives of the construction companies involved in constructing the Eletrobras facilities alleged herein.

7. In late 2014 and early 2015, Operation Car Wash broadened to encompass Eletrobras, and facts surfaced implicating Defendants in an equally massive and strikingly similar corruption scheme. Alberto Youssef, the admitted black market money-launderer at the center of the Petrobras bribery scandal, testified in a deposition that there were fraudulent contracts for specialized consulting, services, and construction with at least four Eletrobras subsidiaries: Eletronorte, Furnas, Eletrosul, and Itaipu. Similarly, Paulo Roberto Costa, a former member of Petrobras' senior management who is now cooperating in Operation Car Wash, likewise testified that Eletrobras' Angra 3 thermonuclear reactor and hydroelectric plants in the North were subject to the same bribery and corruption scheme as plagued Petrobras. Both Youssef and Costa affirmed that the public bidding process at Eletrobras was, in fact, subject to bid-rigging in favor of cartels, resulting in the overpricing of numerous projects.

8. In March 2015, testimony by Dalton Avancini ("Avancini"), the CEO of Brazil's largest construction company, Camargo Corrêa SA ("Camargo Corrêa"), who is among those arrested and accused of paying bribes to obtain contracts, described Eletrobras' involvement in widespread bribery. Avancini testified under oath in the Brazilian criminal probe that a cartel of construction companies including Camargo Corrêa paid kickbacks after winning contracts for the Belo Monte dam project (including funneling money to political officials), and that a similar cartel of builders won a rigged bidding process for contracts to work on Angra 3 in exchange for bribes to Company executives and political parties. Avancini's testimony was later corroborated and elaborated upon by Ricardo Pessoa, the CEO of UTC Engineering, another Angra 3 cartel member.

9. Based on evidence uncovered in Operation Car Wash, an entirely separate investigation, called "Operação Choque," or "Operation Electroshock," was announced on April 15, 2015, which focuses on corruption at Eletrobras' subsidiary, Eletronorte. That same day, authorities arrested Winter Andrade Coelho, Eletronorte's Assistant Director of Operations. Coelho is accused of accepting R$4 million in bribes from companies doing business with Eletronorte during the previous three years and funneling the money through a company set up by his brother-in-law for that purpose.[2] During the search of Eletronorte's offices, two other Eletronorte employees reportedly attempted to hide or destroy documents related to the investigation.

10. Fernanda Castro Oliveira, the coordinator of Operation Electroshock, stated on April 15, 2015 that the investigation "has a potential to be bigger. We are still in the embryo phase." The Brazilian prosecutor Anselmo Henrique Cordeiro has likewise commented that the investigation into Eletrobras could extend to other areas and not only in the sectors that Winter Andrade Coelho acted directly, saying "[t]he expectation is that the operation be expanded."

11. On July 11, 2015, Brazilian media reported on sworn testimony by the cooperating CEO of UTC Engineering, Ricardo Pessoa, which detailed the bid-rigging and bribery scheme carried out in connection with contracts worth R$2.9 billion for Angra 3. According to Pessoa, after the pre-selected cartel of contractors closed on the contracts on or about September 2014, Defendant Cardeal called the cartel members and instructed them that they must pay a kickback to the Workers' Party in the amount of four percent of the contract price. Defendant Cardeal also purportedly discussed further details of the kickback payment with the finance director of UTC

---

[2] Throughout this Complaint, "R$__" refers to the Brazilian real. One Brazilian real presently equals approximately $0.27 U.S. dollars.

Engineering, and informed Joao Vaccari, then treasurer of the Workers' Party, of the arrangements for the four percent kickback.

12. Following reports of this testimony, Defendant Cardeal called Othon Luiz Pinheiro da Silva ("Pinheiro"), the CEO of Eletrobras Thermonuclear S.A. - Eletronuclear ("Eletronuclear")[3], concerned about the ramifications of the testimony and seeking to get "on the same page" with Pinheiro regarding statements Pinheiro had made about the allegations.

13. Approximately two weeks later, on July 28, 2015, Pinheiro was arrested in the 16th phase of Operation Car Wash, dubbed "Operation Radioactivity." ***Pinheiro has been indicted*** and stands accused of rigging bids in at least 24 separate instances for work on Angra 3 in exchange for more than R$4.5 million in bribes, some of which was allegedly funneled through a sham consulting company he established with his daughter.

14. As a result of the foregoing, the Company has been forced to create three internal commissions to investigate the procurement processes regarding construction of the following five projects: (1) the Angra 3 thermonuclear reactor ("Angra 3"), (2) the Belo Monte hydroelectric dam ("Belo Monte"), (3) the Jirau hydroelectric dam ("Jirau"); (4) the Santo Antonio hydroelectric dam ("Santo Antonio"); and (5) the Teles Pires hydroelectric dam ("Teles Pires"). Eletrobras was also forced to hire outside counsel at Hogan Lovells to conduct independent investigations into these matters.

15. Additionally, Brazil's Central Accounting Office, the Tribunal de Contas da União (the "TCU"), which audits the procurement and contracting practices of companies partially- or wholly-financed by the Brazilian government, has announced probes into the Belo Monte project

---

[3] Eletronuclear is a wholly-owned subsidiary of Eletrobras responsible for the construction of the Angra 3 thermonuclear reactor.

and into Eletrobras' joint ventures with contractors who have been indicted in Operation Car Wash. Through this probe, the TCU has examined the costs and relationships related to Angra 3, Belo Monte, Santo Antonio, Jirau, Teles Pires, and other ongoing Eletrobras projects. As described in the TCU Report of a June 24, 2015 plenary session concerning these matters (the "June 24, 2015 Report"), the TCU expressed concerns regarding the significant cost increases for Belo Monte, Santo Antonio, and Jirau—projects involving the Operation Car Wash-implicated companies.[4] Further, it stated that "the presence of companies denounced in Operation Car Wash for practicing bribery and overpricing in such contracts" created a heightened "possibility of fraud," especially in regard to Belo Monte. With respect to the examination of the internal controls related to the joint venture entities responsible for certain of these projects, the Report stated that "Petrobras has [a] tighter control environment and governance".

16. To date, Eletrobras has been unable or unwilling to file its 2014 annual report on Form 20-F ("2014 Annual Report"), having missed both the initial April 30, 2015 prescription date and the extended deadline of May 15, 2015. On October 27, 2015, the Company filed a "market announcement" with the SEC notifying investors that, as internal and external investigations concerning the Company's violations of the "U.S. Foreign Corrupt Practices Act, the Brazilian anti-corruption Law No. 12,846/2013 and the Code of Ethics of Eletrobras Companies remains on-going," the Company "will not be in a position to file [its] 2014 Form 20-F by November 18, 2015." The Company also advised that it was in the process of applying for its ***third*** extension

[4] Additionally, the TCU noted a need to obtain further information about the possibility of conducting an examination of two major international projects involving Eletrobras and Car Wash-implicated companies: HPP Tumarim (a R$1,149 million project in Nicaragua in which Queiroz Galvao has a 50% stake) and Inambari HPP (a R$7,426.7 million project in Peru in which OAS Construction has a 51% stake).

from the New York Stock Exchange until May 2016 to file its now egregiously delayed 2014 Annual Report.

## II. JURISDICTION AND VENUE

17. The claims asserted herein arise pursuant §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b), 78t(a) and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5]. Jurisdiction exists pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §§1331, 1337 and 1367.

18. Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. §§ 1391(b) and (c). Substantial acts in furtherance of the wrongs alleged and/or their effects have occurred within this District and Eletrobras' securities trade within this district on the NYSE.

19. Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this District. Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this District. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

### A. Plaintiffs

20. The City of Providence is a municipal corporation with its principal address at Providence City Hall, 25 Dorrance Street, Providence, Rhode Island 02903. The City of Providence manages hundreds of millions of dollars in assets on behalf of thousands of beneficiaries associated with the City of Providence, including active and retired public employees

and their dependents. The City of Providence purchased Eletrobras securities during the Class Period and was damaged thereby, as set forth in the certification attached to Plaintiffs' motion for appointment as Lead Plaintiff [ECF No. 16-2].

21. Dominque Lavoie is an individual investor who resides in Florida. Mr. Lavoie purchased Eletrobras securities during the Class Period and was damaged thereby, as set forth in the certification attached to Plaintiffs' motion for appointment as Lead Plaintiff [ECF No. 16-2].

**B. Defendants**

22. Defendant Eletrobras is a semi-public corporation organized under the laws of Brazil, and maintains its principal executive offices at Avenida Presidente Vargas, 409, 13 Floor, Edifício Herm. Stolz, CEP 20071-003, Rio de Janeiro, Brazil. Eletrobrasis Brazil's dominant electric company.

23. Eletrobras was established in 1962 during the presidency of João Goulart. As of December 31, 2013, according to the Company's annual filing, the Brazilian government owned 54.5% of the Company's common shares, which are its voting shares. Since at least 2002, Eletrobras has sponsored ADSs representing the Company's common and preferred equity that are listed on the NYSE, trading under the ticker symbols "EBR" and "EBR/B," respectively.

24. Defendant José Antonio Muniz Lopes ("Lopes") was the CEO of Eletrobras, a member of the Executive Board and a member of Eletrobras' Board of Directors from the start of the Class Period up through February 25, 2011. Lopes signed the Eletrobras Code of Ethics adopted in 2010 that was operative throughout the Class Period. Given his senior position within the Company, he possessed the power and authority to control the contents of the press releases, investor and media presentations, and all filings Eletrobras made with the SEC from the start of the Class Period through February 25, 2011.

25. Defendant José da Costa Carvalho Neto ("Carvalho") replaced Lopes and was appointed as the CEO, a member of the Executive Board and a member of Eletrobras' Board of Directors on February 25, 2011 and continues to hold these positions. Carvalho signed Eletrobras' annual reports on Form 20-F filed with the SEC on July 1, 2011 for the year ended December 31, 2009 (the "2009 Annual Report"), on October 17, 2011 for the year ended December 31, 2010 (the "2010 Annual Report"), on May 22, 2012 for the year ended December 31, 2011 (the "2011 Annual Report"), on May 1, 2013 for the year ended December 31, 2012 (the "2012 Annual Report") and on April 30, 2014 for the year ended December 31, 2013 (the "2013 Annual Report"). He also signed Sarbanes Oxley ("SOX") certifications included in each of the Form Annual Reports. Given his senior position within the Company, he possessed the power and authority to control the contents of the press releases, investor and media presentations and all filings Eletrobras made with the SEC during the Class Period.

26. Defendant Armando Casado de Araújo ("Araújo") served as the Chief Financial Officer and Head of Investor Relations of Eletrobras throughout the Class Period. Araújo signed, among other things, Eletrobras' 2009 Annual Report, 2010 Annual Report, 2011 Annual Report, 2012 Annual Report, and 2013 Annual Report, as well as a SOX certification included in each Form 20-F for those years. Given his senior position within the Company, he possessed the power and authority to control the contents of the press releases, investor and media presentations and all filings Eletrobras made with the SEC during the Class Period.

27. Defendant Valter Luiz Cardeal de Souza ("Cardeal") served as Eletrobras' Chief Generation Officer throughout the Class Period, as well as President of the board of directors of Eletrobras Eletronorte and Eletrobras CGTEE. In these positions, he held ultimate authority for all of the generation projects alleged herein, and has been personally identified as being involved

in the bribery scheme related to Angra 3 by the chief executive officer of one of the cooperating construction companies. Given his senior position within the Company, he possessed the power and authority to control the contents of the press releases, investor and media presentations and all filings Eletrobras made with the SEC during the Class Period.

28. Lopes, Carvalho, Araújo, and Cardeal are collectively referred to as the "Insider Defendants."

29. Because of the Insider Defendants' positions, they had access to the adverse undisclosed information about Eletrobras' financial results, business, operations and practices through access to internal corporate documents, conversations and contact with other corporate officers and employees, attendance at meetings, and through reports and other information provided to them. Each of the Insider Defendants, by virtue of his high-level position, was directly involved in the day-to-day operations of Eletrobras at the highest levels and was privy to confidential information concerning the Company and its business, operations and practices, including the accounting misstatements alleged herein. Their positions of control and authority as officers or directors enabled the Insider Defendants to control the content of the SEC filings, press releases, and other public statements of Eletrobras during the Class Period. Accordingly, each of the Insider Defendants bears responsibility for the accuracy of the public reports and press releases detailed herein, and is liable for the misrepresentations and omissions contained therein.

30. During the Class Period, each of the Insider Defendants substantially participated and had exclusive authority and control over the content of the Company's false and misleading statements, financial results and how those results were communicated to investors. Defendants also engaged in conduct in furtherance of a fraudulent scheme and course of business and were involved in the preparation and dissemination of Eletrobras' false financial records, all of which

made it necessary or inevitable that material misrepresentations and the false results of Defendants' scheme would be communicated to, and mislead, investors.

31. The Insider Defendants were obligated to refrain from falsifying Eletrobras' books, records and accounts, and were prohibited from using the instrumentalities of interstate commerce or the mails to: (i) employ any device, scheme, or artifice to defraud; (ii) make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engage in any act, practice, or course of business which operates or would operate as a fraud upon any person. Defendants' conduct violated the Exchange Act and SEC regulations promulgated thereunder in connection with the purchase or sale of Eletrobras securities.

32. Each of the Defendants is liable as a participant in a fraudulent scheme and course of business whose primary purpose and effect was to operate as a fraud and deceit on purchasers of Eletrobras securities by disseminating materially false and misleading statements and/or concealing material adverse facts about Eletrobras' performance and financial condition. Defendants' scheme deceived the investing public regarding Eletrobras' operations, financial statements, historical and future earnings and the intrinsic value of Eletrobras' securities, enabled the Company to register for sale and sell billions of dollars in Eletrobras securities through long term debt offerings, and caused Plaintiffs and other members of the Class to be damaged as a result of their purchases of Eletrobras securities at artificially inflated prices.

33. The Company's press releases and SEC filings were group-published documents, representing the collective actions of Company management. The Insider Defendants directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary

information concerning the Company and its business, operations, products, growth, financial statements and financial condition, as alleged herein. The Insider Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

34. The Insider Defendants were able to and did control and monitor the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Insider Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance, or cause them to be corrected. Accordingly, each Defendant is responsible for the accuracy of the public reports and releases detailed herein, and is therefore primarily liable for the representations contained therein.

## IV. FACTS RELEVANT TO THE CLAIMS

### A. Company Background

35. Eletrobras is an energy corporation headquartered in Rio de Janeiro, Brazil. It is the dominant utility company in Brazil. Eletrobras operates through three segments: generation, transmission, and distribution of electricity. Eletrobras generates about 35% of Brazil's total electricity generation capacity and its transmission networks comprise approximately 55% of the country's total transmission network. The Company generates electricity through the operation of hydroelectric plants, thermoelectric plants, wind farms, and thermonuclear plants. Eletrobras transmits electricity across 61,534 km of transmission lines throughout Brazil.

36. The Eletrobras group consists of sixteen companies, namely: Eletrobras Holding, Eletrobras Partcipações SA ("Eletropar"), Thermal Electricity Generation Company ("CGTEE"), Hydroelectric Company of São Francisco ("Chesf"), North Central Electric of Brazil SA ("Eletronorte"), Eletrobras Thermonuclear SA ("Eletronuclear"), Eletrosul Centrais SA ("Eletrosul"), Furnas Centrais Elétricas S.A. ("Furnas"), Eletrobras Distribuição Piauí, Eletrobras Distribuição Rondônia, Eletrobras Distribuição Roraima, Eletrobras Distribuição Acre, Eletrobras Amazonas Energia, Eletrobras Distribuição Alagoas, Eletrobras Celg, and Itaipu Binacional. Additionally, Eletrobras conducts much of its business through the approximately 150 special or specific purpose entities ("SPE") it has established with various partners.

37. The Brazilian government is Eletrobras' controlling shareholder. As of December 31, 2013, the Brazilian government held 54.5% of Eletrobras' voting shares. The Brazilian government, among other things, has the right to appoint seven out of the 10 members of Eletrobras' Conselho de Administração (the "Board of Directors") and, through them, a majority of the executive officers responsible for the Company's management, including its Chief Executive Officer.

38. The claims asserted herein arise from a series of false statements of material fact and omissions of material adverse information, made by Defendants throughout the Class Period, concerning: (i) the Company's adherence to first-in-class corporate governance principles and a code of ethics that prohibits, among other illegal or unethical behavior, the acceptance of bribes and award of contracts on the basis of bribes; (ii) the value of Eletrobras' fixed assets and net income; and (iii) the nature and extent of the material weaknesses in the Company's internal controls over financial reporting and disclosures. The revelation of the truth about Eletrobras

through a series of disclosures has caused precipitous declines in the market value of Eletrobras' ADSs and bonds, resulting in substantial losses and damages to Plaintiffs and the Class.

**B. Eletrobras' Involvement in an Extensive Bribery and Bid-Rigging Scheme**

39. Throughout the Class Period, Eletrobras' highest-ranking executives awarded contracts to construction company cartels using bribes and kickbacks funneled to Company executives and political parties.

40. The Company and its executives awarded contracts to cartels of engineering and construction companies in exchange for bribes to Company executives and political kickbacks to the Partido dos Trabalhadores (the "PT Party" or "Worker's Party") and/or the Partido do Movimento Democrático Brasileiro, (the "PMDB" or "Democratic Movement Party") in connection with at least the following five projects: Angra 3, Belo Monte, Jirau, Santo Antonio, and Teles Pires.

41. When investors and analysts questioned the rising costs of Eletrobras' largest construction projects and sought information about the potential return on investment given the increased costs, Eletrobras and the Insider Defendants made representations that the Company was awarding contracts pursuant to a competitive bidding process and related negotiations, as well as the potential return on investment approved by the Board of Directors. In reality, the awards were the product of an undisclosed bribery and kickback scheme.

**C. Defendants Used Capital Projects to Improperly Divert Funds**

42. While knowingly or recklessly using Eletrobras' major projects as the source for funding the bribery and corruption scheme, Eletrobras repeatedly assured investors during the Class Period that the cost overruns were just part of normal operating procedures and that the contracts were fairly negotiated with the contractors. Below are the five projects preliminarily

under investigation by Brazilian Prosecutors and the Company itself, which Plaintiffs allege were part of Defendants' widespread scheme.

**1. Angra 3 Thermonuclear Reactor**

44. The Angra 3 thermonuclear reactor is being constructed as part of a larger complex known as the Angra Nuclear Power Plant. The Angra Nuclear Power Plant is Brazil's sole nuclear power plant, and is operated by Eletrobras' subsidiary Eletronuclear. It is located on the Itaorna Beach in Angra dos Reis, Rio de Janeiro, Brazil. The plant currently consists of two pressurized water reactors, Angra 1, with a net output of 637 megawatts, first connected to the power grid in 1985 and Angra 2, with a net output of 1,350 megawatts connected in 2000. Work on the third reactor, Angra 3, projected to output 1,405 megawatts, began in 1984 but was halted in 1986. Construction started again on June 1, 2010 for entry into service in 2015, but completion of Angra 3 has been delayed until 2018. The estimated total cost of completion of Angra 3 in the Company's 2010 Annual Report was approximately R$9.9 billion.

45. In mid-February 2014, Eletrobras awarded contracts worth approximately R$2.9 billion (or $1.5 billion U.S. dollars) for the largest remaining work on Angra 3 to two consortiums (named "Una 3" and "Angra 3") of construction companies. Eletronuclear's CEO, Pinheiro, who was arrested on July 28, 2015, is alleged by prosecutors to have taken R$4.5 million in bribes from several construction companies in exchange for awarding contracts related to Angra 3 on 24 occasions, going back to 2007. Along with Pinheiro, Flavio Barra, the head of Andrade Gutierrez's engineering unit, was also arrested on July 28, 2015 under Operation Radioactivity. Additionally, Defendant Cardeal has been identified as the Eletrobras official who directed the payment of kickbacks to political party officials.

46. The TCU's June 24, 2015 Report lists the following four outstanding contracts with construction companies involved in Operation Car Wash for work on Angra 3: a R$123.8 million contract with Engevix for electromechanical engineering; a R$1,498 million contract with Andrade Gutierrez Construction for civil works; a R$1,287.7 million contract with the Una 3 consortium for part of the electromechanical assembly work; and a R$1,646.9 million contract with the Angra 3 consortium for the remainder of the electromechanical assembly work. The total value of these contracts is approximately R$4,556.6 million.

47. In September 2015, the contracts totaling R$2.9 billion for construction of Angra 3's electromechanical assembly were suspended as a result of the ongoing investigation and charges pending against the contractors involved. Additionally, the Company has written-off R$5.769 billion for Angra 3 costs—approximately 60% of the 2010 estimated construction budget for the project.

**2. Belo Monte Hydroelectric Dam**

48. The Belo Monte hydroelectric dam is under construction on the Xingu River, a major tributary of the Amazon. Belo Monte will be the third largest hydroelectric dam in the world upon its completion with a planned installed capacity of 11,233 megawatts. Since the Belo Monte dam is designed to divert about eighty percent of the Xingu River flow, which could devastate a large portion of Brazilian rainforest, it has been highly controversial.

49. Plans for the dam began in 1975 but were shelved due to the environmental controversy. Pursuant to a redesign of the project, in August 2010, Norte Energia S.A (an SPE created by Eletrobras) was awarded the contract to construct Belo Monte. Norte Energia is controlled by Eletrobras which owns a nearly 50% stake through its direct ownership (15%) and ownership interests held by Eletronorte (19.9%) and Chesf (15%).

50. Construction of Belo Monte started in 2011 and is planned for completion by 2019. All of the companies that were invited to participate in the bidding for Belo Monte are involved in the bribery scheme at Petrobras. Estimated total costs of constructing Belo Monte have ballooned from R$16 billion to R$29.4 billion as of the third quarter 2015.

51. Testimony from March 2015 given in connection with the Brazilian criminal investigation of the construction companies involved in the bribery schemes has revealed that recent contracts awarded for Belo Monte were the result of bribes and kickbacks paid by a cartel of construction companies. Specifically, the CEO of Camargo Corrêa, one of the lead companies in the cartel of construction companies identified by Brazilian prosecutors, has provided detailed testimony that the Belo Monte contracts were conditioned upon payment of bribes equal to one percent of the contract price, to be paid proportionally by members of the cartel based on their participation level in the contract.

52. Additionally, a whistleblower agreement signed on October 30, 2014 with another top executive of a construction company that is cooperating with Brazilian authorities, Augusto Ribeiro de Mendonca Neto of Toyo Setal Empreendimentos Ltda., promised to provide detailed information and documents about "all the facts related to agreements aimed at reduction or elimination of competition, with prior arrangement [of] winner[s], prices, conditions, batch division, etc., in tenders and contracts" for the construction of Belo Monte.

53. A search of the offices of the former vice president of another construction company involved in the Belo Monte bribery scheme, Gerson Almada of Engevix, has reportedly uncovered documents evidencing the previous combination among the construction companies in the bidding for Belo Monte.

54. On April 15, 2015, Operation Electroshock was launched with the arrest of Eletronorte's then-Director of Operations, Coelho, among others, and a search of Eletronorte's offices.

55. In June 2015, the TCU began a probe into the Belo Monte project. The financial audit is expected to include R$22.5 billion (U.S. $6 billion) – or 76.5% of project costs – in subsidized loans from Brazil's National Bank for Social Development ("BNDES") to dam concessionaire Norte Energia – which is controlled by the Eletrobras group.

**3. Jirau Hydroelectric Dam**

56. Jirau is a 3,750 megawatt hydroelectric dam that is part of a four power plant hydroelectric complex under construction in the Madeira River in the western Amazon region of Brazil. Eletrobras established an SPE, Energia Sustentável do Brasil SA ("ESBR"), for the construction of Jirau. Jirau is operated by Eletrosul and Chesf. Until October 2012, Jirau was partially owned (a 9.9% share) by Camargo Correa, a construction company whose executives have been indicted in Operation Car Wash.

57. Jirau is one of the projects from Brazil's "Program to Accelerate Growth" (or "PAC"), and BNDES financed R$7.22 billion for it in 2009. In 2012, the financing was raised to R$9.545 billion. The last financial report released by ESBR indicates that the expected costs of constructing Jirau, which were approved by the board of directors, have ballooned to approximately R$19.4 billion as of the third quarter 2015.

58. Construction of Jirau began in 2008 and was originally planned to be completed in 2013, but the plant is presently only partially operational. Camargo Correa was originally responsible for construction of Jirau, but after selling its share in ESBR, Camargo Correa was replaced by Odebrecht and Engevix as the primary contractors for the dam's construction.

59. Two of Camargo Correa's executives, Dalton Avancini and Eduardo Leite, have signed whistleblower agreements providing testimony about fraudulent bidding and bribery schemes in connection with Angra 3, Belo Monte, and Jirau.

60. Additionally, a November 20, 2014 article in *O'Globo* reported that the Federal Police found documents referencing Jirau in its search of the offices of Youssef, the notorious money-launderer at the center of the Petrobras investigation. Specifically, a spreadsheet listing Camargo Correa's accounting of costs for Jirau together with the costs of certain Petrobras projects was found in the possessions of Joao Procopio de Almeida Prado, who was in charge of opening and managing offshore and foreign bank accounts in the name of Youssef.

61. Eletrobras, which has missed three deadlines for filing its 2014 Annual Report (April 30, 2015, May 15, 2015 and November 18, 2015) has attributed its delay in filing to the fact that the auditor of Energia Sustentável do Brasil SA resigned because it did not consider itself independent under relevant U.S. independence rules for applying equity method accounting to Eletrobras' consolidated financial statements.

**4. Santo Antonio Hydroelectric Dam**

62. Santo Antonio is a 3,150 megawatt hydroelectric dam in the state of Rondônia. Construction of the dam commenced in October 2008, and partial operation began in March 2012. Eletrobras has a 39% interest in the SPE created to build the dam, Madeira Energia, SA ("MESA"), through Eletrobras' subsidiary, Furnas. Additionally, Santo Antonio Energia is an SPE comprised primarily of Furnas (39%) and entities controlled by two of the construction companies charged in Operation Car Wash—Odebrecht (18.6%) and Andrade Gutierrez (12.4%)—for the purpose of operating the dam.

63. As of December 31, 2010, the Santo Antonio dam was budgeted to cost approximately R$13.795 billion; however, by December 31, 2014, when the plant was represented to be 92.55% complete, the dam's budgeted costs had ballooned to R$20.587 billion, an increase of 49%, or R$6,971 billion in the four-year period. This increase is especially unusual because most of the increase—R$6.315 billion or 44%—came after December 31, 2011[5] and the plant commenced operations in March 2012. This significant increase of R$6.315 billion without any apparent basis suggests that Eletrobras was using the SPE, MESA, to conceal illegal overcharges and payments.

64. In December 2014, the TCU announced it had commenced an investigation of the partnerships between Eletrobras and companies implicated in Operation Car Wash, including the SPEs responsible for Santo Antonio. In its June 24, 2015 Report, the TCU noted the substantial increase in the cost of Santo Antonio from the R$9.5 billion at the first stage of the bidding process to R$19.7 billion through June 2015, stating that "[t]his factor takes on significance because the construction consortium is led by Norberto Odebrecht Construction S.A. . . . ."

**5. Teles Pires Hydroelectric Dam**

65. Teles Pires is an 1,820 megawatt hydroelectric dam on the Teles Pires River in the States of Mato Grosso and Pará. Companhia Hidrelétrica Teles Pires is an SPE formed for the construction of Teles Pires. Its main shareholders are Neoenergia (50.1%), Eletrosul (24.5%), Furnas (24.5%), and a subsidiary of Odebrecht SA (0.9%), which is one of the construction companies implicated in the bribery schemes at both Eletrobras and Petrobras. These companies form the Teles Pires Energia Eficiente consortium.

[5] At December 31, 2011, the projected cost of Santo Antonio was disclosed as over R$14.271 billion.

66. In December 2014, the TCU announced it is investigating the partnerships between Eletrobras and companies implicated in Operation Car Wash, including the SPEs responsible for Teles Pires. In its June 24, 2015 Report, the TCU noted that construction of Teles Pires had been contracted with Odebrecht.

67. Construction of Teles Pires began in August 2011, and service was originally expected to begin by September 2014.

## V. DEFENDANTS PUBLICLY MISREPRESENTED AND CONCEALED THEIR VIOLATIONS OF THE COMPANY'S CORPORATE ETHICS AND GOVERNANCE DIRECTIVES

68. Throughout the Class Period, Defendants misrepresented that they refused any form of corruption, bribery or kickback. Contrary to their representations, Defendants materially misstated and failed to disclose that they were engaged in a massive bribery and corruption scheme operating in direct contravention of the publicly-available policies set forth in the Company's Code of Ethics and corporate governance directives.

69. In June 2010, Eletrobras updated and amended its "Code of Ethics: Ethical Principles and Conduct Commitments" (hereinafter, "Code of Ethics"). Described as a "historical mark" for Eletrobras, the Company asserted that "[f]or the first time, in a single Code of Ethics, we have registered all principles and ethical, organizational and personal commitments to be adhered to by all Eletrobras Companies."

70. In the Company's 2010 Annual Report, Defendants asserted that the Code of Ethics was binding on all employees of Eletrobras, regardless of position:

> ***Code of Business Conduct and Ethics***
> NYSE rules require that listed companies adopt and disclose a code of business conduct and ethics for directors, officers and employees, and promptly disclose any waivers of the code for directors or executive officers. Applicable Brazilian law does not have a similar requirement but in 2010 we have introduced the Ethics Code of Eletrobras Companies

> ("Código de ÉticaÚnico das Empresas Eletrobras") which provides for the ethical principles to be observed by all the members of the board of directors, executive officers, employees, outsourced staff, service providers, trainees and young apprentices.

71. The Code of Ethics was effective throughout the Class Period and the Company maintains that it remains effective today. The Code of Ethics states:

> The result is a clear definition of the principles that guide the actions and commitments related to institutional conduct, present in the interactions of the Eletrobras Companies, with their employees, collaborators, suppliers and other audiences with whom they are involved.
>
> Now, it is time for all the collaborators from the Eletrobras Companies to acknowledge and incorporate the values contained in this Code. Ethics is consolidated this way: every day, in each person's work and in small actions, which, together, define the culture of a company.

72. In accordance with the above, the Code of Ethics was signed by the President of every Eletrobras affiliate company, including Pinheiro, the CEO of Eletronuclear. The Code of Ethics[6] includes a statement of seven Ethical Principles, which include:

> II. INTEGRITY
> Complying with commitments undertaken to honesty and probity, in which discourse and actions are coherent, and ***repudiating any manner of fraud and corruption*** by maintaining an active stand under situations which are not in compliance with the ethical principles.
> …
> IV. TRANSPARENCY
> Ensuring visibility of criteria, which charter the decisions made and actions taken by Eletrobras Companies by communicating in a clear, ***accurate***, agile and accessible manner, taking into account the limits to the right of confidentiality.
>
> V. IMPARTIALITY
> Establishing that ***public interests must be above personal ones*** in order to ensure objectivity and impartiality in decisions, actions and in the use of resources from Eletrobras Companies.
>
> VI. LEGALITY

[6] All emphasis in the Complaint is added unless otherwise specified herein.

> ***Complying with Brazilian laws and with the legislation of countries in which Eletrobras Companies operate, as well as with internal norms which regulate the activities of each company***, in accordance with Brazilian constitutional principles and international treaties entered by Brazil.
>
> VII. PROFESSIONALISM
> Performing in a professional manner, with integrity, responsibility and care, based on social values, loyalty and mutual respect, in which the excellence and development of Eletrobras Companies are a common commitment.

73. This declaration of principles was materially misleading because Defendants were then engaging in an ongoing scheme in which contracts were awarded, not on a basis of fair bidding and competition, but on the basis of bribery and kickbacks. The scheme, by its very nature, lacked integrity, impartiality, legality, and professionalism. Further, by failing to make proper corrective disclosures – including the repeated delay of filing the Company's 2014 Annual Report, Defendants have not fulfilled their stated commitment to transparency.

74. Section 1 of the Code of Ethics is titled "Commitments of Eletrobras Companies Related to Corporate Governance." Individual subsections roundly reject the conduct complained of herein, which included specifically includes bribes and kickbacks. Section 1 of the Code of Ethics stated, in pertinent part:

> 1.1. ***To make corporate decisions based on the principles of ethics, transparency, integrity, loyalty, impersonality, legality*** and efficiency, and to use their economic-financial resources with responsibility in order to attain higher levels of competitiveness, excellence and profitability, taking into account the legitimate interest of all stakeholders and their sustainability related commitment.
>
> * * *
>
> 1.3. To base their relationship with stakeholders on proactive ***communication that is accurate, proper, transparent and timely***, making all information promptly available in order to deflate rumor and speculation.
>
> * * *
>
> 1.6. To perform aligned to public policies, **making no exception to the interference and favoring of partisan or private interests**, both related to corporate decisions and holding of positions.
>
> * * *

> 1.9. ***To refuse and denounce any form or attempt of corruption, bribery, kickback and "backscratching***."
>
> 1.10. ***Not to give support or contributions to political parties or political campaigns for elected offices***.

75. The statements contained in Section 1 of the Code of Ethics were materially false and misleading because, despite representing to the public that Eletrobras and its affiliates/subsidiaries adhered to a Code of Ethics as provided in Section 1.1, Defendants were engaged in a massive bribery and corruption scheme that operated in direct contradiction to the publicly-available policies set forth in the Company's Code of Ethics.

76. In addition, rather than communicate with its stakeholders in a proactive manner "that is accurate, proper, transparent and timely, making all information promptly available in order to deflate rumor and speculation," as provided in Section 1.3, the Company has issued a series of passive, reactive, and ultimately insubstantial press releases that do not deflate rumor and speculation regarding Operation Car Wash and its impact on the Company and failed to timely issue its 2014 Annual Report.

77. Moreover, while the Company publicly represented that it would comply with public policies without consideration of partisan or private interests, as provided in Section 1.6, it was secretly engaged in a pattern of kickbacks and bribery intended to benefit the partisan interests of certain Brazilian politicians, while providing additional personal financial benefits to top executives, including Pinheiro and Coelho. Finally, while the Company publicly represented otherwise as provided in Section 1.9, Defendants engaged in a campaign of corruption, bribery, kickbacks, and "back scratching" in connection with the development of various facilities, including Angra 3, Belo Monte, Jirau, Santo Antonio, and Teles Pires. This conduct also contradicted the Company's representation that it was an apolitical entity, as provided in Section

1.10, because some or all of the bribes and kickbacks discovered by Operation Car Wash funded election donations for Brazilian officials of the Workers' Party or PMDB.

78. Section 2.2 of the Code of Ethics is titled "Commitment of Employees to Eletrobras Companies." Individual subsections roundly reject the conduct complained of herein, which included bribes and kickbacks. Section 2.2 of the Company's Code of Ethics required of its employees, in part:

> 2.2.1. ***To know and comply with the Ethics Code***.
>
> * * *
>
> 2.2.6. To talk on behalf of the company only when duly authorized to do so or when detaining the required competency, respecting each area in charge of maintaining a relationship with communication and press release agencies and capital market and ***not to disseminate untruthful, misleading or confidential information***.
>
> * * *
>
> 2.2.8. To respect the workplace by ***not engaging in any manner in improper behavior*** that might hinder the good performance of activities.
>
> * * *
>
> 2.2.17. ***Not to use work time, position and administrative influence for their own benefit or to obtain favors for themselves or third-parties***.
>
> * * *
>
> 2.2.22. ***Not to offer or accept gifts, privilege, payment, loan, donation, service or any other manner of benefit*** for their own enjoyment of for third parties.
>
> * * *
>
> 2.2.23. ***To refuse and denounce to the proper areas any manner or attempt of corruption, bribery, kickback and "backscratching".***

79. These statements were materially false and misleading or omitted material facts that rendered them misleading because: (i) despite representing to the public that Eletrobras and its affiliates/subsidiaries adhered to a Code of Ethics, as provided in Sections 2.2.1, the Company and Insider Defendants were engaged in a massive bribery and corruption scheme that operated in direct contradiction to the publicly-available policies set forth in the Company's Code of Ethics; (ii) despite publicly representing its prohibition on "disseminat[ing] untruthful, misleading or confidential information," as provided in Section 2.2.6, the Company nevertheless was releasing

misleading information that did not to disclose the existence of the bribery/kickback scheme, the extent of its impact on the Company, and failing to issue corrective disclosures showing the impact of the scheme on the company' s balance sheet and income statement; (iii) despite representing to the public its prohibition against "improper behavior" that might interfere with Company operations, as provided in Section 2.2.8, in actuality the Company was engaging in a pattern of illegal activity; (iv) despite representing to the public that Eletrobras officers were not to use their position to obtain favors for themselves or third parties nor influence the administration of competitive companies, as provided Sections 2.2.17, in the Defendants' bribery and kickback scheme operated to their personal benefit and the benefit of certain Brazilian politicians in the form of election donations, all while undermining a fair and competitive bidding process for construction projects at Angra 3, Belo Monte, Jirau, Santo Antonio, and Teles Pires; (v) while the Company publicly represented otherwise, in Sections 2.2.22 and 2.2.23, Eletrobras engaged in a campaign of corruption, bribery, kickbacks, and "back scratching" in connection with the development of the Angra 3, Belo Monte, Jirau, Santo Antonio, and Teles Pires construction projects.

80. Section 3 of the Code of Ethics is titled "Commitment of Eletrobras Companies and their Employees to Suppliers, Service Providers, Other Partners and Clients." Individual subsections roundly reject the conduct complained of herein, which included bribes and kickbacks. Section 3 of the Code of Ethics states, in part:

> 3.1. To select and hire suppliers and service providers according to legal, technical, quality, cost and timeliness criteria, where an ethical profile of responsible socioenvironmental responsibility must be in place.
>
> 3.2. To refuse unfair competition practices, child labor, sexual harassment and exploitation of children and adolescents, forced labor or degrading work conditions, as well as any manner of physical, sexual, moral or psychological abuse and other practices that breach this Ethics Code,

> including in the production chain of their suppliers and to denounce the offender.
>
> 3.3. Not to participate in negotiations that might result in personal advantage or benefits that could be construed as actual or apparent conflict of interest for the employees involved from either party.
>
> * * *
>
> 3.11. Not to accept or give gifts, bonuses or advantages, even in the form of preferential treatment given to or for clients, suppliers, service providers and other partners associated to the businesses or interest of the Eletrobras companies.

81. These statements were materially false and misleading or omitted material facts that rendered them misleading because: (i) despite representing to the public that suppliers would be selected based on objective criteria of "legal, technical, quality, cost and timeliness" and that "unfair competition practices" would be rejected, instead the Company chose to do business with suppliers and contractors that participated in the bribery/kickback scheme as pled herein; (ii) despite representing to the public that "unfair competition practices" would be refused, as provided in Section 3.2 of the Code, Eletrobras and its affiliates/subsidiaries adhered to a Code of Ethics mandating , the Company and Insider Defendants were engaged in a massive bribery and corruption scheme that operated in direct contradiction to the publicly-available policies set forth in the Company's Code of Ethics; (iii) despite public representations that employees would not to participate in negotiations that might result in personal advantage or benefits that could be construed as actual or apparent conflict of interest, as provided in Section 3.3, the defendants nevertheless engaged in a course of conduct by which they would award contracts to suppliers in exchange for bribes and kickbacks; (iv) despite representing to the public that the Company and its affiliates would not "accept or give gifts, bonuses, or advantages even in the form of preferential treatment," as provided in Section 3.11, the Company nevertheless awarded contracts related to the Angra 3, Belo Monte, Jirau, and Santo Antonio in exchange for bribes and kickbacks.

82. Section 6 of the Code of Ethics is titled “Commitment of Eletrobras Companies to Society, Government, State, Controlling and Regulating agencies.” Individual subsections roundly reject the conduct complained of herein, which included bribes and kickbacks. Section 6 of the Code of Ethics states, in part:

> 6.3. To comply with governmental guidelines and to perform as an effective partner of government to implement policies and projects that address the country’s sustainable development.
>
> 6.4. To cooperate with public authorities when they are carrying out their legal functions.

83. These statements were materially false and misleading or omitted material facts that rendered them misleading because Sections 6.1 and 6.2 both expressly and impliedly represented that the Company would comply with the law, perform as an effective partner of government, and cooperate with public authorities as they carried out their legal functions – yet the Company and the other defendants engaged in an ongoing and massive bribery and kickback scheme in violation of the law and undermining the Company’s relationship with the Brazilian government.

84. Section 8 of the Code of Ethics is titled “Commitment of Eletrobras Companies to Business Competition.” Individual subsections roundly reject the conduct complained of herein, which included bribes and kickbacks. Section 8 of the Code of Ethics states, in pertinent part:

> 8.2. To make business decisions taking into account their best interest, observing and defending the norms of freedom of competition, in compliance with Brazilian legislation and the laws of countries where they operate.

85. These statements were materially false and misleading or omitted material facts that rendered them misleading because despite representing to the public in Section 8.2 that business decisions would be made in a manner defending the norms of freedom of competition,

and in compliance with Brazilian (and other countries' laws), the Company actually did not award contracts based on competitive bidding, and instead awarded them to contractors who agreed to participate in the bribery and kickback scheme, which was subsequently uncovered by Operation Car Wash.

86. On November 19, 2010, Eletrobras filed a Form 6-K with the SEC regarding "Message 647, [which was] published in today's Diário Oficial da União, [and] forwarded a draft of a Bill removing Eletrobras from the fiscal effort to meet the primary surplus target of the public sector accounts." The November 19, 2010 Form 6-K was signed by Defendant Araújo. In the November 19, 2010 Form 6-K Eletrobras misrepresented that:

> The Administration of Eletrobras has been improving its corporate governance in recent years, a key component for achieving strategic goals of growth, profitability and market position, both nationally and internationally. ***Eletrobras is a transparent company*** followed by national and international markets and is subject to assessment by rating agencies which have classified the company with sovereign risk rating.

87. On June 8, 2011, Eletrobras filed a Form 6-K with the SEC announcing the 51st Annual General Meeting. The June 8, 2011 Form 6-K included a Message from the Management which stated, *inter alia*:

> Most of the reliability acquired and consolidated by Eletrobras in 2010 was based on the deployment of a crucial and new document to our companies: the first Integrated Strategic Plan. Gathering Eletrobras' mission, values and vision for 2020, the plan derived from the joint effort of professionals of all companies and it started the creation of the business plans that will guide our performance in the next years. ***With increasingly professional management and transparency, Eletrobras did not have problems to raise more than US$ 1 billion in the international market in order to leverage the development of its businesses in Brazil and abroad, only in 2010.***[7]

[7] *See* ¶¶ 230-234, *infra*.

88. On August 27, 2014, Eletrobras filed a 6-K containing a document titled, "Presentation to Analysts and Investors, August 2014." The presentation misleadingly highlighted the Company's corporate governance structure and its importance in "Maximization of company values" with the following graphic:




89. The presentation also touted the Company's inclusion on the "corporate sustainability" indices of BMF & Bovespa (Brazilian stock exchanges) for the sixth consecutive year and the Dow Jones Sustainability Indices for the Emerging Markets, which it states was created "to indicate the companies that adopt best sustainable governance practices."

90. On September 16, 2014, Eletrobras misleadingly touted its inclusion for the third consecutive year in the Dow Jones Sustainability Emerging Markets Index ("DJSI") in the Utilities sector, highlighting that the Company achieved the maximum score with respect to "Codes of

Conduct/Compliance/Corruption & Bribery, [and] Risk & Crisis Management," among other subjects.

91. In the Company's 2013 Annual and Sustainability Report, filed in a 6-K with the SEC on September 29, 2014, Eletrobras misleadingly highlighted its purported adherence to its Code of Ethics as follows:

> The Eletrobras companies have a unified Code of Ethics that guides their internal relationship and interaction with the other segments of society. To ensure compliance with the concepts described in the Code of Ethics of the company and of the Public Ethics Committee, Eletrobras has put in place a management system that is coordinated by the Ethics Committees formally established in each of its companies.

92. On November 28, 2014, the Company filed a 6-K misleadingly announcing that:

> Eletrobras obtained, once again, the recognition of their corporate sustainability practices, having been kept in the portfolio of the Corporate Sustainability Index of BM&F Bovespa (ISE-Bovespa) in 2015, which will be valid for 01/05/2015 to 01/02/2016. Such certification, for the eighth consecutive year, demonstrates the commitment of the Company and its employees to promote continually to improve its business activities, based on ethics, transparency and social and environmental responsibility.

93. The statements set forth at ¶¶ 86-92, *supra*, were materially false and misleading because they presented Eletrobras as observing first-in-class corporate ethics and governance provisions, when in reality, the Company was engaged in an extensive bribery and bid-rigging scheme throughout the Class Period.

## VI. DEFENDANTS MISREPRESENTED AND FAILED TO FULLY DISCLOSE THE MATERIAL DEFICIENCIES IN THE COMPANY'S INTERNAL CONTROLS

94. Defendants had a responsibility to establish and maintain adequate internal control over financial reporting which they failed to fulfill throughout the Class Period. At all relevant times, Defendants knew that Eletrobras' controls were materially deficient and allowed the Company's financial statements to be materially false and misleading.

95. In the 2010 Annual Report, Defendants concluded that Eletrobras' disclosure and procedures were not effective as of December 31, 2010, and that the design and operation of

Eletrobras' disclosure controls and procedures were not effective to provide reasonable assurance that all material information relating to Eletrobras was reported as required.

96. Defendants acknowledged that at December 31, 2010, Eletrobras' financial reporting environment had deficiencies such that material misstatements could occur in the financial statements without detection or prevention. Specifically, Eletrobras stated that:

> We did not maintain effective internal controls over financial reporting based on the COSO criteria. The following material weaknesses related to our controls over financial reporting were identified: 1) we did not maintain an effective controls environment, specifically: (i) internal control deficiencies were not remediated in a timely manner; and (ii) we did not adequately define responsibility with respect to our internal controls over financial reporting and the necessary lines of communication throughout the organization; 2) we did not adequately perform a risk assessment to identify risks so as to ensure that effective controls were adequately designed and implemented that would prevent and detect material misstatements to our financial statements; 3) we did not adequately design and maintain effective information technology policies, including those related to segregation of duties, security and access (grant and monitor) to our financial application programs and data.

97. However, the Company represented that, to improve the situation, it had "…already begun the process of establishing the controls and procedures required by the Sarbanes Oxley Act of 2002." Moreover, the Company stated that:

> Notwithstanding management's assessment that our disclosure controls and procedures were not effective and that there were material weaknesses as identified above, ***we believe that our financial statements contained in this annual report fairly present our financial position, results of operations and cash flows for the years covered thereby in all material respects.***

98. Finally, the 2010 Annual Report included certifications (at Exhibit 12.1 and 12.2) executed by the CEO, Carvalho, and the CFO, Araújo. The certifications were substantially identical, stating:

> I, [José da Costa Carvalho Neto, Chief Executive Officer/ Armando Casado de Araújo, Chief Financial Officer], certify that:

1. I have reviewed this annual report on Form 20-F of CENTRAIS ELÉTRICAS BRASILEIRAS S.A. – ELETROBRAS (the "company")

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements and other financial information included in this report fairly present in all material respects the financial condition, results of operations and cash flows of the company as of and for the periods presented in this report;

4. The company's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the company and have:

a) Designed such disclosure controls and procedures or caused such disclosure controls and procedures to be designed under our supervision to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting; and

5. The company's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and to the audit committee of the company's board of directors (or persons performing the equivalent function):

> a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and
>
> b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

99. Mr. José da Costa Carvalho, and the Chief Financial Officer, Mr. Armando Casado de Araújo executed substantially identical certifications in three Form 20-F/As for the fiscal year ended December 31, 2010, filed with the SEC on December 2, 2011, January 31, 2012, and April 25, 2012.[8]

100. The Company's poor internal control environment at December 31, 2010 was designed to enable Defendants to surreptitiously engage in their bribery and kickback scheme and inflate the carrying value of Eletrobras' assets. Defendants designed a complex corporate structure involving numerous SPEs to conceal financial transactions designed to enrich themselves, as well as their joint venture partners – the construction companies.

101. For each year end December 31, 2011 through December 41, 2014, Eletrobras acknowledged that its internal controls contained substantially the same material weaknesses and that it failed to maintain effective internal controls over financial reporting. However despite this fact, at each reporting period the Company falsely represented that its financial statements were ***fairly presented***. In other words, while these material weaknesses existed within Eletrobras, investors were told not to worry because Defendants had ensured that at each reporting period Eletrobras had compensated for these deficiencies, providing investors with a false assurance that the financial statements were fairly presented.

---

[8] The certifications consistently appeared at Exhibit 12.1 and 12.2 to the amended Form 20-Fs referenced herein.

102. After a delay, on May 22, 2012 the Company filed its 2011 Annual Report with the SEC. Therein, the Company made a risk disclosure relative to material weaknesses in its internal controls that was virtually identical to the one it made in its 2010 Annual Report, as alleged in ¶¶ 95-96, *supra*.

103. At Item 15 of the 2011 Annual Report, the Company once again admitted its material weaknesses with its internal controls. The Company's 2011 disclosure at Item 15(a) was substantially similar to the previous year, "conclud[ing] that our disclosure controls and procedures were not effective as of December 31, 2011, and that the design and operation of our disclosure controls and procedures were not effective to provide reasonable assurance that all material information relating to our company was reported as required…"

104. Its 2011 Annual Report revealed that ***all eight material weaknesses previously disclosed in 2010 were recurrent in 2011***. Moreover, the Company's material weakness regarding proper accounting controls for property, plant and equipment – which was limited to Itaipu in 2010 – had actually ***worsened*** to become a Company-wide issue in the 2011 fiscal year:

> We did not adequately design and maintain effective design and operating controls with respect to accounting for property, plant and equipment, specifically, to ensure the completeness, accuracy and validation of these acquisitions.

105. Further, the Company added a ***ninth*** material weakness in its internal controls for the Fiscal Year Ended December 31, 2011: "We did not maintain effective controls to ensure the accuracy over the identification of the amounts of repayments for subsidy related to the Fuel Consumption Account (CCC)."

106. Despite the apparently worsening condition of its internal controls for the year ended December 31, 2011, Defendants nevertheless represented their belief to investors that the 2011 financial statements were fairly presented in all material respects.

107. On or around May 1, 2013 – following a brief delay – the Company filed its 2012 Annual Report. Therein, the Company made risk disclosures relative to its internal controls that were identical to those described in ¶¶ 95-96, *supra*.

108. Yet again, the Company disclosed recurrent material weaknesses in its internal Controls. At Item 15 of the 2012 Annual Report, the Company conceded that its controls were still not effective and detailed six specific material weaknesses. Five of the six material weaknesses for Fiscal Year 2012 were recurrent from Fiscal Years 2010 and 2011, including: the failure to maintain effective internal controls over financial reporting based on COSO criteria; the failure to effectively review and monitor recurring and non-recurring journal entries; the failure to ensure accuracy and completeness of judicial deposits; failure to ensure completeness and accuracy of post-retirement benefits plans; and a failure to ensure appropriate staffing, review and monitoring of IFRS financial statement preparation.

109. Additionally, the Company offered greater specificity regarding its failure to adequately value its property, plant, and equipment – which had been an issue for at least the last two reporting periods. For 2012, the Company disclosed that its internal controls surrounding the impairment of fixed assets were ineffective as follows: "We did not adequately design and maintain effective controls with respect to the impairment calculation of assets. Specifically, there is no evidence of the analysis of financial information that was used for the impairment calculation of assets."

110. The Company further stated, regarding its material weakness with respect to the impairment calculation of assets, that it had taken remedial action and that this weakness was "non-recurring."

111. Notwithstanding the above – and the troubling repetition of the same internal control weaknesses from year to year – the Defendants nevertheless maintained their statement that the 2012 financial statements were fairly presented in all material respects.

112. On or around April 30, 2014, the Company filed its 2013 Annual Report. Therein, the Company made risk disclosures about its internal controls that were identical those described above.

113. Additionally, the Company again announced that its evaluation of internal controls "…concluded that our disclosure controls and procedures were not effective as of December 31, 2013, and that the design and operation of our disclosure controls and procedures were not effective to provide reasonable assurance that all material information relating to our company was reported as required…"

114. Further, the Company identified five "material weaknesses" in its internal controls which were substantially similar to previously-reported problems. Further, notwithstanding the Company's assertion in its 2012 Annual Report that the failure to maintain adequate internal controls over impairment calculations was a nonrecurring event, the 2013 disclosures provided that "[The Company] did not adequately design and maintain effective controls with respect to the impairment calculation of assets."

115. The Company further disclosed a new material weakness in its internal controls, noting that "[w]e did not maintain effective review, monitoring and approval controls over specific enterprise resource planning, or ERP, that could lead to non authorized manual journal entries."

116. Notwithstanding the above – and the troubling repetition of the same internal control weaknesses from year to year – Defendants nevertheless continued to represent that the 2013 financial statements were fairly presented in all material respects.

117. Thereafter, at December 31, 2014, in its annual CVM filing dated May 29, 2015, Eletrobras management continued to acknowledge that Eletrobras' "internal control over financial reporting was not effective because material weaknesses existed." Further, Defendants stated that:

> Regarding our remediation of the material weakness related to our compliance program, pursuant to the requirements of the FCPA and the Brazilian anti-corruption Law No. 12846/2013, our management is in the process of improving and strengthening our compliance program which is currently being implemented by our companies. We started implementing our compliance program at the end of 2014.

118. Accordingly, throughout the Class Period, Defendants not only failed to maintain a sound internal control environment but knowingly allowed Eletrobras to issue materially false and misleading financial statements because its internal control environment was essentially nonexistent. During this five year period, Defendants did virtually nothing to correct or implement adequate internal controls over its financial reporting, including the reporting by SPEs, compliance with laws and regulations and the preparation of financial statements in accordance with generally accepted accounting principles, and therefore had no reasonable basis to state that Eletrobras' financial statements were fairly presented.

119. The forgoing admissions about the internal control environment at Eletrobras are demonstrative of Defendants' reckless disregard of any standard of care involving the fair presentation of Eletrobras' financial statements during the Class Period and its disclosure of material information to investors.

## VII. DEFENDANTS MISREPRESENTED AND FAILED TO DISCLOSE THAT KEY FINANCIAL METRICS IN THE COMPANY'S FINANCIAL STATEMENTS WERE MATERIALLY FALSE AND MISLEADING

120. Throughout the Class Period, Eletrobras materially misrepresented its financial condition by: (1) materially overstating its reported Property, Plant, and Equipment ("PP&E")

assets and correspondingly overstating net income or understating net losses; (2) materially understating expenses for asset impairments, improperly capitalizing period expenses, and improperly capitalizing illegal payments; (3) failing to timely recognize losses from SPEs; and (4) failing to report and disclose related party transactions. The financial statements of Eletrobras include the consolidated financial statements, prepared in accordance with IFRSs issued by the IASB and the generally accepted accounting principles in Brazil (indentified as "IFRS Consolidated – BR GAAP"), and the holding level financial statements prepared in accordance with generally accepted accounting principles in Brazil, (identified as "Holding Level – BR GAAP").

**A. Applicable International Financial Reporting Standards**

121. At all relevant times, Eletrobras recklessly disregarded the applicable International Financial Reporting Standards ("IFRS") by falsely representing that the Company's consolidated financial statements were prepared and presented in compliance with the IFRS issued by the International Accounting Standards Board ("IAS"). Specifically, Defendants violated, *inter alia*, the following generally accepted accounting principles.

122. First, financial statements shall present fairly the financial position, financial performance and cash flows of an entity. Fair presentation requires the faithful representation of the effects of transactions, other events and conditions in accordance with the definitions and recognition criteria for assets, liabilities, income and expenses set out in the *Framework*. [IAS 1]. An entity whose financial statements comply with IFRS shall make an explicit and unreserved statement of such compliance in the notes. An entity shall not describe financial statements as complying with IFRS unless they comply with all requirements of IFRS. [IAS 1]. Material

omissions or misstatements of items are material if they could, individually or collectively, influence the economic decisions that users make on the basis of the financial statements.

123. Next, an entity like Eletrobras must apply the same accounting policies in its interim financial statements as are applied in its annual financial statements, except for accounting policy changes made after the date of the most recent annual financial statements that are to be reflected in the next annual financial statements. [IAS 34]. Because an investor like Eletrobras has joint control of, or significant influence over, the investee, the investor has an interest in the associate's or joint venture's performance and, as a result, the return on its investment. The investor accounts for this interest by extending the scope of its financial statements to include its share of the profit or loss of such an investee. As a result, application of the equity method provides more informative reporting of the investor's net assets and profit or loss. [IAS 28].

124. Moreover, when downstream transactions provide evidence of a reduction in the net realizable value of the assets to be sold or contributed, or of an impairment loss of those assets, those losses shall be recognized in full by the investor.[9] When upstream transactions provide evidence of a reduction in the net realizable value of the assets to be purchased or of an impairment loss of those assets, the investor shall recognize its share in those losses. [IAS 28]. After application of the equity method, including recognizing the associate's or joint venture's losses in accordance with paragraph 38, the entity applies paragraphs 41A – 41C to determine whether there is any objective evidence that its net investment in the associate or joint venture is impaired. [IAS 28].

9 "Downstream" transactions are, for example, sales or contributions of assets from the investor to its associate or its joint venture.

125. In addition, objective evidence of impairment for the net investment in the equity instruments of the associate or joint venture includes information about significant changes with an adverse effect that have taken place in the technological, market, economic or legal environment in which the associate or joint venture operates, and indicates that the cost of the investment in the equity instrument may not be recovered. A significant or prolonged decline in the fair value of an investment in an equity instrument below its cost is also objective evidence of impairment. [IAS28] A joint venturer shall recognize its interest in a joint venture as an investment and shall account for that investment using the equity method in accordance with IAS 28 *Investments in Associates and Joint Ventures* unless the entity is exempted from applying the equity method as specified in that standard. [IFRS 11].

126. Moreover, the cost of an item of property, plant and equipment shall be recognized as an asset if, and only if: (i) it is probable that future economic benefits associated with the item will flow to the entity; and (ii) the cost of the item can be measured reliably. [IAS 16]. An item of property, plant and equipment that qualifies for recognition as an asset shall be measured at its cost. [IAS 16]. To determine whether an item of property, plant and equipment is impaired, an entity applies IAS 36 *Impairment of Assets*. That Standard explains how an entity reviews the carrying amount of its assets, how it determines the recoverable amount of an asset, and when it recognizes, or reverses the recognition of, an impairment loss. [IAS 16].

127. An entity shall assess at the end of each reporting period whether there is any indication that an asset may be impaired. If any such indication exists, the entity shall estimate the recoverable amount of the asset. [IAS 36]. In assessing whether there is any indication that an asset may be impaired, an entity shall consider, as a minimum, the following indications:

(i) there are observable indications that the asset's value has declined during the period significantly more than would be expected as a result of the passage of time or normal use;

(ii) significant changes with an adverse effect on the entity have taken place during the period, or will take place in the near future, in the technological, market, economic or legal environment in which the entity operates or in the market to which an asset is dedicated…;

(iii) the carrying amount of the net assets of the entity is more than its market capitalization;

(iv) evidence is available of obsolescence or physical damage of an asset;

(v) significant changes with an adverse effect on the entity have taken place during the period, or are expected to take place in the near future, in the extent to which, or manner in which, an asset is used or is expected to be used. These changes include the asset becoming idle, plans to discontinue or restructure the operation to which an asset belongs, plans to dispose of an asset before the previously expected date, and reassessing the useful life of an asset as finite rather than indefinite. [IAS 36]. An impairment loss shall be recognized immediately in profit or loss. [IAS 36].

## B. The Company Materially Overstated PP&E And Correspondingly Misstated Earnings Throughout the Class Period

### 1. Statements Concerning 2009 Earnings and PP&E

128. On July 1, 2011, the Company filed its 2009 Annual Report with the SEC reporting its 2009 financial results. Eletrobras reported total PP&E of R$74.435 billion, R$9.456 billion in investments in affiliates, and a net loss of R$1.633 billion.

129. These 2009 PP&E and earnings statements were materially false and misleading when made because the 2009 loss was understated by a minimum of R$63 million due to the improper inclusion in PP&E of the value of bribes paid in connection with the Eletrobras projects alleged herein.

130. The 2009 Annual Report also states, with respect to the depreciation and amortization of the Company's PP&E:

> We record property, plant and equipment at construction or acquisition cost, as applicable, less accumulated depreciation calculated based on the straight-line method, at rates that take into consideration the estimated useful lives of the assets. Repair and maintenance costs that extend the useful lives of the related assets are capitalized, while other routine costs are charged to our result of operations. Interest relating to debt obtained from third parties incurred during the construction period is capitalized.

131. Further, the 2009 Annual Report states, in Note 2 to the consolidated financial statements "Summary of main accounting practices" under the section "I) Property, plant and equipment", the following:

> Property, plant and equipment is stated at acquisition and construction cost, restated to reflect price-level changes through December 31, 1997, less accumulated depreciation calculated based on the straight-line method at rates that take into consideration the estimated useful lives of the assets. Repair and maintenance costs which extend the useful lives of the related assets are capitalized, while other routine costs are charged to results of operations.
>
> * * *
>
> The Company's management reviews property, plant and equipment for possible impairment whenever events or changes in circumstances indicate that the carrying value of an asset or group of assets may not be recoverable from operating earnings on an undiscounted cash flow basis. The reviews are carried out at the lowest level of asset groups to which management is able to attribute identifiable future cash flows.
>
> When management determines that the carrying value of property, plant and equipment may not be recoverable, any impairment loss, is measured based on a projected discounted cash flow method using a discounted rate determined to be [commensurate] with the risk inherent in the company's current business model.

132. The statements contained in ¶¶ 130-131, *supra*, concerning the Company's accounting policies with respect to PP&E were materially false and misleading when made because Eletrobras: (i) reported PP&E in excess of costs due to capitalizing overcharges to cover bribes and political kickbacks; (ii) impairment was not timely or adequately recorded for the

generation assets; and (iii) capitalized costs that should have been expensed as maintenance or period costs in violation of their disclosures.

### 2. Statements Concerning 2010 Earnings and PP&E

133. On October 17, 2011, the Company filed its 2010 Annual Report reporting net income of R$2.553 billion for the year. Additionally, Eletrobras reported fixed assets of R$46.682 billion, R$4.725 billion in investments, and R$2.264 billion in intangible assets.

134. These 2010 PP&E and earnings statements were materially false and misleading when made because profit was overstated by a minimum of R$128 million due to the improper inclusion in fixed assets of the value of bribes paid in connection with the Eletrobras projects alleged herein.

135. Additionally, the 2010 Annual Report stated that "[t]he financial statements of the Company for the year ended December 31, 2010 are the first annual consolidated Financial Statements in compliance with the IFRSs [International Financial Reporting Standards]." It also stated that the 2009 Annual Report was prepared in accordance with U.S. Generally Accepted Accounting Principles ("GAAP"), which may differ from IFRSs.

136. Further, the 2010 Annual Report describes the depreciation and amortization of the Company's PP&E as it did in the 2009 Annual Report, set forth at ¶ 130, *supra*.

137. The 2010 Annual Report also states, in Note 3 to the consolidated financial statements "Summary of Significant Accounting Policies" under the section "3.13 Fixed assets", the following:

> At the transition date the Company has concluded that the generation assets, including those of nuclear generation and certain corporate assets are out of the scope of IFRIC 12 "Service concession arrangements" (Note 3.14), thus being demonstrate at cost, less accumulated depreciation and impairment. In the case of qualifying assets, the borrowing costs are capitalized according to the requirements of IAS 23 "Borrowing costs", which is described below in the Note 3.13.1. Such

> fixed assets are classified in adequate categories of fixed assets when they are concluded and ready for the intended use. Depreciation of these assets starts when they are ready for the intended use on the same basis as other fixed assets. Land is not subject to depreciation.
>
> Depreciation is calculated based on the estimated useful life of each asset, using the straight line method, so that the carrying value of the asset less its residual value, after the end of its useful life, is fully written off (except for land and construction in progress). The Company believes that the estimated useful life of each asset is similar to depreciation rates established by ANEEL, which are deemed as acceptable by the market. Additionally, in connection with the Company's understanding of the current legislation on concession arrangements and based on an opinion of an independent legal advisor, it was considered the indemnification at the end of the concession based on the residual book value, and this factor was also considered in measuring fixed assets (see details in Note 17).
>
> Assets held through financial leasing are depreciated by the expected useful life, as assets owned by the Company, or for a shorter period, if applicable, under the terms of the respective leasing contract.

138. The statements contained in ¶¶ 135-137, *supra*, concerning the Company's accounting policies with respect to PP&E and fixed assets were materially false and misleading when made because Eletrobras: (i) reported PP&E in excess of costs due to capitalizing overcharges to cover bribes and political kickbacks; (ii) impairment was not timely or adequately recorded for the generation assets; and (iii) capitalized costs that should have been expensed as maintenance or period costs in violation of their disclosures.

### 3. Statements Concerning 2011 Earnings and PP&E

139. On May 22, 2012, the Company filed its 2011 Annual Report, reporting 2011 financial results. In particular, Eletrobras reported total PP&E of R$53.215 billion, R$4.571 billion in investments, R$2.371 billion in intangible assets, and net income of R$3.762 billion. The 2011 Annual Report was signed by Defendants Carvalho and Araújo.

140. These 2011 PP&E and earnings statements were materially false and misleading when made because the profit was overstated by a minimum of R$188 million due to the improper

inclusion in PP&E and fixed assets of the value of bribes paid in connection with the Eletrobras projects alleged herein.

141. The 2011 Annual Report also contains the same statement regarding the depreciation and amortization of the Company's PP&E as set forth in ¶ 130, *supra*, and substantially the same statement regarding the Company's accounting policies for fixed assets as set forth in ¶ 137, *supra*. Those statements concerning the Company's accounting policies and practices with respect to PP&E and fixed assets were materially false and misleading when made because Eletrobras: (i) reported PP&E in excess of costs due to capitalizing overcharges to cover bribes and political kickbacks; (ii) impairment was not timely or adequately recorded for the generation assets; and (iii) capitalized costs that should have been expensed as maintenance or period costs in violation of their disclosures.

### 4. Statements Concerning 2012 Earnings and PP&E

142. On May 1, 2013, the Company filed its 2012 Annual Report and reported its 2012 financial results. Eletrobras reported total PP&E of R$47.407 billion, R$5.398 billion in investments, R$2.301 billion in intangible assets, and a net loss of R$6.926 billion. The 2012 Annual Report was signed by Defendants Carvalho and Araújo.

143. These 2012 PP&E and earnings statements were materially false and misleading when made because the 2012 loss was understated by a minimum of R$346 million due to the improper inclusion in PP&E and fixed assets of the value of bribes paid in connection with the Eletrobras projects alleged herein.

144. The 2012 Annual Report contains substantially the same statement regarding the depreciation and amortization of its PP&E as set forth in ¶ 130, *supra*.

145. The 2012 Annual Report further states, in Note 3 to the consolidated financial statements "Summary of Main Accounting Policies" under the section "3.10. Fixed Assets", the following:

> The Company has evaluated that part of its generation assets, including nuclear generation and certain assets of corporate use that do not qualify as being within the scope of IFRIC 12 – Service Concession Arrangements (Note 3.13). Until December 31, 2011, these assets were demonstrated at value cost, deducted from depreciation and by the loss on reduction in accumulated recoverable amount. As of December 31, 2012, supported by its concession agreements and the rules applied for indemnity asset established by Law 12,783/2013 (see note 2.1), the Company considered the reversion of residual net assets to the Granting Authority at the end of the public service of electricity generation concession. Thus, for non extended assets, it started to adopt the premise that they will be indemnified by the New Replacement Value (VNR) depreciated, calculated based on the methodology, the parameters and basic criteria used by the Energy Research Company – EPE in the calculation of indemnification from the concessionaires directly affected by the Provisional Measure 591/2012 and subsequent Law 12,783/2013, keeping the lower value between the net book value and the estimated NRV. Borrowing costs are recorded, in the case of qualifying assets, capitalized in accordance to the Company's accounting policy. These fixed assets are classified in adequate categories of fixed assets when they are concluded and ready for their intended use. Depreciation of these assets starts when they are ready for the intended use in the same basis as other fixed assets.
>
> Depreciation is calculated based on the estimated useful life of each asset, by the linear method, so that the cost value less its residual value, after its useful life, is fully written off (except for land and constructions in progress). The Company considers that the estimated useful life of each asset is similar to the depreciation rates established by ANEEL, which are deemed as acceptable by the market as they appropriately express assets' useful life. Additionally, in connection with the Company's understanding of the current regulatory framework for concessions, including those mentioned above MP and Law, it has been considered the indemnification at the end of the concession based on the lower value between the VNR or net book value, this factor being considered in measurement of fixed assets (see details in Note 16).
>
> Assets held through financial leasing are depreciated by the expected useful life, as assets owned by the Company, or for a shorter period, where applicable, under the terms of the respective leasing contract.
>
> A fixed asset item is written off after sale or when there are no future economic benefits resulting from continuous use of the asset. Any gains and losses in sales or write-off of fixed asset items are determined by the difference between the amounts

> received from the sale and the carrying amount and are recognized in the income statement of the year.

146. The statements contained in ¶¶ 144-145, *supra*, concerning the Company's accounting policies with respect to PP&E and fixed assets were materially false and misleading when made because Eletrobras: (i) reported PP&E in excess of costs due to capitalizing overcharges to cover bribes and political kickbacks; (ii) impairment was not timely or adequately recorded for the generation assets; and (iii) capitalized costs that should have been expensed as maintenance or period costs in violation of their disclosures.

**5. Statements Concerning 2013 Earnings and PP&E**

147. On April 30, 2014, the Company filed its 2013 Annual Report and reported its 2013 financial results. Eletrobras reported PP&E of R$30.038 billion, investments of R$17.414 billion, and intangibles of R$788 million. Eletrobras also reported a net loss of R$6.291 billion for 2013. The 2013 Annual Report was signed by Defendants Carvalho and Araújo.

148. These 2013 asset and earnings statements were materially false and misleading when made because the 2013 loss was understated by a minimum of R$315 million due to the improper inclusion in PP&E and fixed assets of the value of bribes paid in connection with the Eletrobras projects alleged herein.

149. Concerning depreciation and amortization of its PP&E and intangible assets, the 2013 Annual Report stated:

> We record property, plant and equipment as construction or acquisition costs, as applicable, less accumulated depreciation calculated based on the straight-line method, at rates that take into consideration the estimated useful lives of the assets. Repair and maintenance costs that extend the useful lives of the related assets are capitalized, while other routine costs are charged to our result of operations. Interest relating to debt obtained from third parties incurred during the construction period is capitalized. Amortization of intangible assets, included in the scope of IFRIC 12, is based on the concession period.

150. These statements concerning the Company's accounting policies and practices with respect to PP&E and intangible assets were materially false and misleading when made because Eletrobras: (i) reported PP&E in excess of costs due to capitalizing overcharges to cover bribes and political kickbacks; (ii) impairment was not timely or adequately recorded for the generation assets; and (iii) capitalized costs that should have been expensed as maintenance or period costs in violation of their disclosures.

#### 6. Statements Concerning 2014 Earnings and PP&E

151. On April 16, 2015, the Company filed an amended 6-K the full-year 2014 net loss of R$3.031 billion. Reported consolidated assets in the 6-K included PP&E of R$31.168 billion, investments of R$20.070 billion, and intangibles of R$1.365 billion.

152. These 2014 asset and earnings statements were materially false and misleading when made because the 2014 loss was understated by a minimum of R$148 million due to the improper inclusion in fixed assets of the value of bribes paid in connection with the Eletrobras projects alleged herein.

### C. Eletrobras Understated And Improperly Accounted For Certain Expenses

153. Throughout the Class Period, Defendants materially understated expenses for asset impairments, improperly capitalized period expenses, and improperly capitalized illegal payments made in connection with Angra 3.

154. Prior to the Class Period, construction on Angra 3 through a contract with Andrade Gutierrez was halted, resulting in an annual payment of R$5.0 million by Eletrobras to Andrade Gutierrez in order to preserve the contract, maintain the contractor's facilities, and for the use of its facilities. Eletrobras, in violation of IFRS, improperly capitalized this annual payment and reported the same as property and equipment in its financial statements, so as to avoid an annual

charge to expense of R$5 million. In 2009, a revised contract for approximately R$1.5 billion was entered into with Andrade Gutierrez as Eletrobras attempted to restart the project.

155. At December 31, 2010, Eletrobras reported consolidated fixed assets (property, plant & equipment) of R$46,682,498,000; included within this amount was approximately R$630,857,000 of costs associated with the Angra 3 reactor. The amount reported for the Angra 3 costs was after a write-off recorded in the fourth quarter of 2010, amounting to R$1,293,147,000 which Eletrobras reported as a charge to shareholders' equity at December 31, 2010 versus a charge to reported earnings. Eletrobras' 2010 fourth quarter Marketletter disclosed the write-off of approximately 67% of the initial capitalized costs of Angra 3 as follows:

> For the suitability of this project to the current accounting practices, and in accordance with new accounting practices, the write-off of the value of R$1,293,147 thousands, retroactive to January 1, 2009, corresponding to the mentioned expenditures (financial and administration), appropriated during the period of interruption of the works. With this write-off, the residual value, plus the estimated cost to finish the plant, will total the amount consistent with the feasibility studies conducted.

| | |
|---|---|
| Recorded value of construction in progress – Angra 3 project, on existing fixed assets before accounting adjustments due to the new CPCs. | R$ 1,924,004 |
| Write-off of financial and administrative expenses of the period of interruption of the works of Angra 3, according to current law. | R$(1,293,147) |
| Total at December 31, 2010 | R$ 630,857 |

156. In contravention of IFRS, this write-off does not appear to be an impairment charge, but rather a write-off of improperly capitalized costs such as interest and maintenance fees that were previously capitalized as Angra 3 facility assets. Furthermore, based on a review of the Company's public filings, there does not appear to be a disclosure of the write-off recorded on the

Angra 3 facility of R$1,293,147 as set forth above. The only disclosure of the write-off was in a fourth quarter 2010 Market Letter.

157. Thereafter, during the fourth quarter of 2013, Eletrobras reported that it had recorded an impairment charge related to capitalized costs associated with the Angra 3 facility in the amount of more than R$532 million, "largely due to the delay in the construction schedule". At the same time, the Marketletter disclosed that Eletrobras had invested during 2013 approximately R$1.5 billion into the Angra 3 project. The following year, in its Marketletter 4Q14 Annex, Eletrobras disclosed additional impairment charges for the Angra 3 project as follows. "The operational provisions, increased by 5,038%, from a provision of R$12.2 million in 3Q14 to a provision of R$602 million in 4Q14, mainly due to the register of impairment related to plant Angra 3 in the amount of R$558 million." Finally, in the quarter ended September 30, 2015, Eletrobras reported an impairment charge related to Angra 3 of a staggering R$3,386 million, stating: "In relation to the Angra 3 project, the Company has recognized an accumulated loss due to impairments totaling R$3,385,556 thousand pursuant to CPC 01/IAS-36-*Impairment of Assets*. As of September 30, 2015, the accumulated impairment amounted to R$4,475,899 thousand."[10] [Marketletter 3Q15 Annex]. Specifically, the 3rd Q15 Marketletter included the following statements:

> The equity of Eletronuclear in the 3Q15 was negative in the amount of R$2,843 million, being the main reason for the magnitude of the negative result recorded by the Company in this quarter. This loss in Eletronuclear resulted from the impairment conducted in the 3Q15, referring to investment in Angra 3….
>
> On August 1, 2015, the press announced the leniency agreement entered into by and between the Brazilian Administrative Council of Economic Defense (CADE) and Construtora Camargo Corrêa to denouncing anti-competitive conduct in relation to the electromechanical assembly works for the Angra 3 power plant. The companies cited to have taken part in this include: Construtora Andrade Gutierrez

---

[10] This amount excludes the R$1,293 million fourth quarter 2010 write-off.

> S.A., Construtora Norberto Odebrecht S.A, Construtora Queiroz Galvão S.A., Construções e Comércio Camargo Corrêa S.A., Empresa Brasileira de Engenharia S.A., Techint Engenharia e Construções S.A. and UTC Engenharia S.A. ...
>
> On September 2, 2015, Eletronuclear suspended for 60 days the agreement providing for the electromechanical assembly of the Angra 3 power plant to investigate the eligibility requirements made in the procurement procedure as well as the economic and financial health of the remaining companies in the, “ANGRAMON“ consortium. On September 28, 2015, Eletronuclear suspended for 90 days the agreement with Construtora Andrade Gutierrez, which was responsible for the construction of the Angra 3 power plant. This suspension may be extended for up to 120 days.
>
> In relation to the Angra 3 project, the Company has recognized an accumulated loss due to impairments totaling R$3,385,556 thousand pursuant to CPC 01/IAS 36 – Impairment of Assets. As of September 30, 2015, the accumulated impairment amounted to R$4,475,899 thousand.

158. The September 30, 2015 write-off of R$3,385 million represented approximately 50% of Eletrobras capitalized costs attributable to the Angra 3 nuclear power plant. Eletrobras had very little disclosure regarding the R$3,385 million write-off merely disclosing the following in the Marketletter 3Q2015: “The operating expenses increased by R$3,487.7 million, or 794.1%, from R$492.2 million in 2015 to R$3,926.8 million in 3Q2015. This increase was due primarily to the register of impairment related to Angra 3 in the amount of R$3,386 million.” Accordingly, Eletrobras during the period of December 2010 through September 30, 2015 had written-off approximately R$5,769.3 million of improperly capitalized costs or approximately 63% of the estimated construction budget of the Angra 3 nuclear power plant in 2010 after the project was restarted. This is an astonishing amount of write-offs for a project estimated to cost R$9.9 billion. Moreover, the fact that Eletrobras’ disclosure of the nature of the impairment charges has been vague and less than transparent confirms that Eletrobras used the construction of Angra 3 to cover up overcharges, improperly capitalized costs, and illegal payments that Defendants engaged in during the Class Period.

159. In order to estimate the quantitative amount of overcharges and therefore the overstatement of the Eletrobras assets attributable to Angra 3, the above calculation is based in part on an assumed overcharge of at least 3% on the gross contract value of the Angra 3 construction costs. The following are the estimated gross contract values by supplier as of December 31, 2014 for the construction of the Angra 3 and the related estimated overstatement of the assets attributable to the Angra 3 project (note these amounts/contracts were obtained from Eletrobras' Forms CVM and certain news articles, such as an article dated December 22, 2014 from the UOL News):

| ***Contract*** | | ***Amount (Millions)*** |
|---|---|---|
| Consortium – Andrade Gutierrez, Camargo Correa, Norberto Odebrecht and UTC | R$ | 1,647.0 |
| Andrade Gutierrez | R$ | 1,439.1 |
| Queiroz Galvao | R$ | 1,287.7 |
| Confab | R$ | 406.5 |
| Engevix | R$ | 248.6 |
| Bardella | R$ | 213.8 |
| AF Consult | R$ | 189.4 |
| Concremat | R$ | 187.2 |
| Logos Engenharia | R$ | 118.7 |
| Nuclep | R$ | 92.5 |
| Prysmian | R$ | 73.3 |
| Ductor | R$ | 70.9 |
| IBQN | R$ | 68.2 |
| Tuv Nord | R$ | 65.0 |
| Arcadis Logos | R$ | 64.8 |
| DELP | R$ | 48.6 |
| Siemens Brasil | R$ | 47.2 |
| Odebrecht | R$ | 32.2 |
| Fuzi-Tec | R$ | 18.9 |
| Somax | R$ | 14.3 |
| KSB | R$ | 12.5 |
| Others | R$ | 85.1 |
| Total contract value | R$ | 6,431.5 |

160. Based on an estimated construction contract value in excess of R$6 billion (note that current estimates for the total cost of construction of Angra 3 are approximately R$15 billion and at December 31, 2014 the plant was estimated to be approximately 60% complete). The contractors named as being involved in the corruption scheme include, but are not limited to,

Andrade Gutierrez, Camargo Correa, Engevix, Mendes Junior, OAS, Queiroz Galvao, UTC, Odebrecht, EBE, Techint, and Galvao Engenharia. Accordingly, there is a reasonable basis to assert that, at a minimum, there are R$180 million of improper capitalized overcharges within the Angra 3 contracts at December 31, 2014. However, this amount does not account for the other improperly capitalized costs attributable to Angra 3.

161. A reasonable charge to Eletrobras reported earnings should have been taken for the impairment, overcharges and illegal payments associated with the Angra 3 project as follows:

| | |
|---|---|
| December 31, 2010 | R$ 200 million |
| December 31, 2011 | R$ 500 million |
| December 31, 2012 | R$ 300 million |
| December 31, 2013 | R$1,000 million |

162. Thus, Eletrobras materially understated and improperly accounted for the described expenses throughout the Class Period.

**D. Eletrobras Failed to Timely Recognize Losses From SPEs**

163. Eletrobras utilized SPEs as a means to conceal Defendants' actions regarding overcharges, bribes and kickbacks. Much like in Enron, this complex structure provided Defendants with the ability to maintain and conceal off balance sheet transactions and not report losses within the Company's consolidated financial statements. In particular, the Company misstated financial information for the SPEs responsible for Santo Antonio, Belo Monte, and Jirau during the Class Period, as detailed below.

**1. Madeira Energia S.A. ("MESA")**

164. As noted above, MESA is an SPE with the purpose of building and operating the Santo Antonio hydroelectric plant, and is owned 39.0% by Eletrobras Furnas (which is an

essentially wholly-owned subsidiary of Eletrobras), 18.6% by Odebrecht Energia, 12.4% by Andrade Gutierrez, 10% by Cemig, and 20% by Fundo de Investimentos e Participacoes da Amazonia.

165. The following table summarizes Eletrobras' reported investments in MESA as of December 31, 2014:

| *(Amounts in thousands)* | *Budgeted costs* | *Costs incurred* |
|---|---|---|
| December 31, 2014 | R$20,587.0 | R$ 3,732.6[11] |
| December 31, 2013 | R$17,203.0 | R$ 15,826.7 |
| December 31, 2012 | R$16,352.0 | Not Disclosed ("ND") |
| December 31, 2011 | R$14,271.9 | ND |

166. At December 31, 2010, Eletrobras disclosed that the assets and liabilities of MESA were R$8,393,184,000 and R$8,294,170,000, respectively. At December 31, 2012, Eletrobras disclosed that,

> The Company holds 39% of the capital of Maderia Energia. The investee incurring expenses of constitution related to the development of the construction project of San Antonio, which, according to the financial projections prepared by the management, should be absorbed by future revenues from operations. On December 31, 2012, the charge and negative net working capital of R$1,166,329 (December 31, 2011 – R$1,279,002).

167. At December 31, 2013, Eletrobras further stated:

> As of December 31, 2013, the Company holds investments in Norte Energia S.A., Madeira Energia S.A. and Interligacao Eletrica do Madeira S.A., which have incurred significant expenses related to the development of the hydroelectric projects of Belo Monte and Santo Antonio, Such expenses, pursuant to estimates of the investee's management, shall be absorbed by the future revenues of the projects. The conclusion of the construction work and subsequent beginning of operations depend on the capacity of these entities to continue to obtain the proceeds required to continuity and conclusion of the projects. In addition, the investees Manaus Transmissora de Energia S.A. and

[11] *See* 11.1.2.1 SPE fourth quarter 2014 – Only Furnas.

> Norte Brasil Transmissora de Energia S.A., on which the Company holds interests of 49.50% and 49%, respectively, recorded excess of liabilities over current assets in the amounts of R$171,738 thousand and R$322,499 thousand.

168. Furthermore, Eletrobras disclosed in its 4th Quarter 2014 Marketletter that, "On December 31, 2014, Madeira Energia SA (MESA), of which Furnas detains a 39% equity interest, showed an excess of liabilities towards its current assets in the amount of R$482 million." Additionally, Eletrobras disclosed in its 2014 CVM, "Equity in profit and losses of associates decreased by R$1,395 million from income of R$178 million in 2013 to a loss of R$1,217 million in 2014, largely due to (i) operational losses of R$461 million incurred by Energia Sustentavel do Brasil, which operates HPU Jirau, during 2014; and (ii) operational losses incurred by Madeira Energia SA." Additionally, in its 4th Quarter 2014 Marketletter, Eletrobras disclosed that, "Shareholdings line registered a 784.5% decrease, from a net income in the amount of R$ 178 million in 2013 to a net expense in the amount of R$ 1,217 million in 2014. The variation was due mainly to amounts related to equity investments in affiliated companies and also by the negative results obtained by SPE Madeira Energia S.A (Santo Antonio Hydroelectric Power Plant)."

169. At December 31, 2014, Eletrobras' guarantee of MESA outstanding debt balances totaled approximately R$44,000,000. These guarantees add to the financial exposure Eletrobras undertook for these SPEs.

170. Finally, the budgeted cost for Santo Antonio hydroelectric project was approximately R$13,795.5 (in millions) in December 2008, which skyrocketed to R$20,587 million by 2014, or an increase of approximately 50% over original estimates. This provides a definite indication that Eletrobras was capitalizing costs in excess of recoverability (impairment) or overcharges.

**2. Norte Energia, S.A.**

171. Norte Energia is an SPE owned 49.98% by Eletrobras with the purpose of conducting all necessary activities of the implementation, operation and maintenance of the Belo Monte hydroelectric plant. The following table summarizes the total assets reported within the Norte Energia SPE, for the Belo Monte project:

| ***(Amounts in thousands)*** | ***Budgeted costs*** | ***Costs incurred*** |
|---|---|---|
| December 31, 2014 | R$ 29,375.0 | R$16,769.90[12] |
| December 31, 2013 | R$ 29,375.0 | R$12,478.40 |
| December 31, 2012 | R$29,375.0 | ND |
| December 31, 2011 | R$25,885.1 | ND |

172. At December 31, 2010, Eletrobras disclosed assets and liabilities of Norte Energia R$312,263,000 and R$147,076,000, respectively. The total construction contract costs for Belo Monte were approximately R$28 billion. The consortium responsible for the construction of Belo Monte was comprised of: Carmargo Correa, Andrade Gutierrez, Norberto Odebrecht, OAS ltda., Queiroz Galvao, J. Malucelli, Contern, Galvao Engenharia, Serveng-Civilsan and Centenco. In addition, the following contractors were involved in the project: Engevix Engenharia, Industria Metalurgica e Mecanica de Amazonia (JV between Alstom and Bardella) and Engie (previously GDF Suez).

173. Dalton Avancini, ex-president of Camargo Correa, testified that his company paid R$20 million in exchange for its 15% share of the Belo Monte construction contract. Gerson Almada, a partner in Engivex Engenharia confessed to paying R$2.2 million in exchange for Belo Monte construction contracts. Moreover, Odebrecht, Andrade Gutierrez, OAS, Queiroz Galvao,

---

[12] *See* 11.1.2.1 SPE 4th Q14/13 Annex (Eletronorte).

and Galvao Engenharia have all reportedly paid bribes to obtain Belo Monte construction contracts.

174. While Eletrobras had certain partners in its SPEs, Eletrobras was exposed for essentially the full amount of the project costs due to the fact it guaranteed the full amount of the liabilities of the SPE. Specifically, Norte Energia was established by Chesf (15%), Eletronorte (19.98%) and the Company (15%) (for a total Eletrobras Group ownership of 49.98%), in addition to other partners, to build and operate Belo Monte. The Company guarantees the liabilities of the SPE to the insurance company J MALUCELLI under the insurance contract between the SPE and J MALUCELLI. The Company also guarantees a short-term loan from BNDES.

175. If on an overall basis, the assets were overstated by approximately 3-5% due to kickbacks, overcharges and bribes, then the asset overstatement of Norte Energia would be:

| | |
|---|---|
| December 31, 2014 | R$1.338 billion |
| December 31, 2013 | R$1.052 billion |
| December 31, 2012 | R$ .683 billion |
| December 31, 2011 | R$ .362 billion |

176. On an equity basis, Eletrobras should have reported a loss from impairment/ overstatement of the Belo Monte project reported assets due to the improper capitalization of overcharges, bribes/kickbacks under the construction contracts of at least the following:

| | |
|---|---|
| December 31, 2014 | R$669 million |
| December 31, 2013 | R$526 million |
| December 31, 2012 | R$342 million |
| December 31, 2011 | R$181 million |

### 3. Energia Sustentavel do Brasil S.A. ("ESBR")

177. ESBR's main purpose was the development of the Jirau hydroelectric plant located in the Madeira River. ESBR is owned 39.89% by Eletrobras. Camargo Correa was the principal contractor for the Jirau hydroelectric plant project and held a 9.9% ownership interest in ESBR until 2012. GDF Suez acquired the 9.9% interest of Camargo Correa in October 2012 for approximately R$539 million. The estimated Jirau hydroelectric plant project capital expenditure was approximately R$16 billion as of December 2012. Eletrobras did not identify the transactions with Camargo Correa as related party transactions. The following table summarizes Eletrobras' reported investment in ESBR:

| ***(Amounts in thousands)*** | ***Budgeted cost*** | ***Costs incurred*** |
|---|---|---|
| December 31, 2014 | R$18,969.0 | R$18,780.70[13] |
| December 31, 2013 | R$17,986.0 | R$17,114.72 |
| December 31, 2012 | R$16,128.9 | ND |
| December 31, 2011 | R$15,371.0 | ND |

178. At December 31, 2010, Eletrobras disclosed assets and liabilities of ESBR of R$6,624,371,000 and R$4,564,365,000, respectively. As of December 31, 2012, in its 4th quarter Marketletter, Eletrobras disclosed that:

> The provisions for the Onerous Contract line item at Jirau plant in the 4Q12 (R$711.4 million), without comparison with the previous quarter, since inevitable costs to fulfill the contract obligations surpassed the economic benefits, which we hope to receive throughout the life of the contract.

[13] *See* 11.1.2.1 SOE 4thQ14/13 Annex (Eletrosul).

### E. Eletrobras Misrepresented and Failed to Properly Disclose Related-Party Transactions

179. IAS 24 requires Eletrobras to identify related parties within its financial statements and additionally disclose "the nature of the related party relationship as well as information about those transactions and outstanding balances, including commitments, necessary for users to understand the potential effect of the relationship on the financial statements." An entity is related to a reporting entity for the purposes of IAS 24 if any of the following conditions applies: (i) one entity is an associate or joint venture of the other entity (or an associate or joint venture of a member of a group of which the other entity is a member); (ii) both entities are joint ventures of the same third party; or (iii) one entity is a joint venture of a third entity and the other entity is an associate of the third entity."

180. Throughout the Class Period, Eletrobras failed to disclose in its financial statements certain related-party transactions in violation of IAS 24 of the IFRS. Specifically, while Eletrobras acknowledged certain relationships, it failed to disclose the transactions between the related parties, the nature and amount of the transactions and the terms and conditions of the transactions as required by generally accepted accounting principles. For example, Eletrobras acknowledged the following relationships with contractors—most of whom are involved in the Operation Car Wash bribery scandal: (1) Andrade Gutierrez, who was a partner with Eletrobras in at least the following SPEs: MESA; Estacao Transmissora de Energia S.A.; and Norte Brasi Transmissora de Energia S.A.; (2) Odebrecht, who was a partner with Eletrobras in at least the following SPEs: Cia. Hidreletrica Teles Pires S.A.; MESA (3) Camargo Correa, who was a partner with Eletrobras in at least ESBR; (4) Engevix, who was a partner with Eletrobras in at least the following SPEs: MGE Transmissao S.A.; and Goias Transmissao S.A.; and (5) J. Malucelli, who was a partner with Eletrobras in at least the following SPEs: Goias Transmissao S.A., MGE Transmissao S.A., Rei

dos Ventos 3 Geradora de Energia S.A., Transenergia Renovavel S.A., Transenergia Goias S.A., and Serra do Facao Energia S.A.

181. Despite acknowledging the above Eletrobras' joint venture partners in the SPEs responsible for Belo Monte, Jirau, Santo Antonio, and Teles Pires, among others, as well as the relationships with suppliers for the Angra 3 reactor project, Eletrobras failed to disclose the transactions between the parties, the nature and amount of the transactions, and the terms and conditions of the transactions.

## VIII. DEFENDANTS MISREPRESENTED AND FAILED TO DISCLOSE THE SCHEME'S IMPACT ON CERTAIN CONSTRUCTION COSTS AND DEVELOPMENTS

182. Throughout the Class Period, Defendants misrepresented and failed to disclose that, in stark contrast to the statutorily-mandated public bidding process and Defendants' statements, contracts were not awarded based on a competitive public bidding and negotiation process, but rather, were awarded to pre-selected members of a cartel based on agreements to pay bribes and kickbacks. Defendants further failed to disclose that the costs of the projects included money for the payment of bribes and kickbacks, and that the scheme could impact the timeline for completion of the projects.

183. On August 17, 2010 the Company held a conference call with analysts and investors to announce its second quarter 2010 financial results. During the conference call, an analyst asked if the Company intended to disseminate the contract details for Belo Monte, "especially regarding CapEx and levering financing conditions." In response, Defendant Araújo stated as follows:

> Yes. We are finishing the negotiations. Our engineering director is working full time on this topic, closing and signing contracts. . . .We have already some signals about how the funding is going to be and we have to close this, perhaps this coming year, we will be able to provide this information.

184. Defendants' statements concerning the Belo Monte contract terms and developments in the preceding paragraph were materially false and misleading when made, and were known or deliberately disregarded as such by Defendants, because Defendants misrepresented and failed to disclose that contracts were awarded to pre-selected members of a cartel based on agreements to pay bribes and kickbacks, and such agreements impacted the costs and timeline of the project.

185. On November 26, 2010, Eletrobras filed a Form 6-K with the SEC regarding "the article published today in the newspaper Valor Economico, entitled 'Minority shareholders want more data of the Eletrobras controlled companies.'" In response to the article, Eletrobras stated, among other things, as follows regarding the Belo Monte and Angra 3 construction projects:

> In the case of Belo Monte Project, and Angra 3, mentioned in the article, the guidelines, including minimum profitability, were fully approved by the Board of Directors. As the funding and contracts with suppliers are being negotiated by the company, it is not possible yet to determine the final profitability of the two projects.

186. These statements were materially false and misleading when made, and were known or deliberately disregarded as such by Defendants, because Defendants failed to disclose that the projects' contract costs and negotiations were impacted by the illicit bribery scheme.

187. On October 17, 2011, the Company filed its 2010 Annual Report, which stated the following regarding the Angra 3 construction project:

> Eletrobras Eletronuclear started the construction of a new nuclear plant, called Angra III, during the second half of 2009. The construction is estimated to take between 3 and 5.5 years. On March 5, 2009, IBAMA issued an installation license to Eletrobras Eletronuclear with a validity of 6 years and on March 9, 2009, CNEN issued a partial construction license to Eletrobras Eletronuclear. Once constructed, we estimate that Angra III will have an installed capacity of 1,405 MW and that the cost of its construction will be approximately R$9.9 billion.

188. These statements were materially false and misleading when made, and were known or deliberately disregarded as such by Defendants, because Defendants failed to disclose that the Angra 3 construction costs and timeline for completion were being significantly impacted by the bribery scheme..

189. On November 8, 2011, Eletrobras filed a Form 6-K (the "November 8, 2011 Form 6-K") with the SEC "in relation to the matter published in the newspaper Valor Economico, of November 4, 2011, under the title 'Minority representative wants information about Belo Monte and Angra 3.'" In the November 8, 2011 Form 6-K, Eletrobras stated, among other things that "we hereby clarify our Shareholders and the Market in General that the administration of Eletrobras adopts full transparency on all company investments and acts of governance, analyzing them from the point of view of business, risk and return." The Company further stated that in its regulatory filings and on its website, it provided "all the information of our subsidiary companies, detailing all our power plants and all our transmission lines in operation and under construction, with the updated value of the investment of each of these projects." The November 8, 2011 Form 6-K was signed by Defendant Araújo.

190. These statements were materially false and misleading when made, and were known or deliberately disregarded as such by Defendants, because investments related to Belo Monte and Angra 3 were impacted by the secret bribery scheme.

191. On May 22, 2012, the Company filed its 2011 Annual Report, which stated the following regarding the Angra 3 construction project:

> Eletrobras Eletronuclear started the construction of a new nuclear plant, called Angra III, during the second half of 2009. The construction is estimated to take between 3 and 5.5 years . . . . Once constructed, we estimate that Angra III will have an installed capacity of 1,405 MW and that the cost of its construction will be approximately R$10.5 billion.

192. These statements were materially false and misleading when made, and were known or deliberately disregarded as such by Defendants, because Defendants failed to disclose that the Angra 3 construction costs and timeline for completion were significantly impacted by the bribery scheme.

193. On June 1, 2012, during a conference call to discuss the Company's first quarter 2012 financial results, in response to an analyst who asked about the expected revenue from Belo Monte and Angra 3, Defendant Araújo stated: "I said that we had capital costs of 8.5%. When we take all our investments, our expectation is that we want to preserve this profitability."

194. These statements were materially false and misleading when made, and were known or deliberately disregarded as such by Defendants, because Defendants failed to disclose that the costs and profitability of the projects were materially impacted by the bribery scheme.

195. On December 27, 2012, the Company filed a Form 6-K with the SEC informing shareholders and the market that "on December 21, 2012, a financing agreement was signed with Caixa Economica Federal, in the amount of R$3.8 billion, with the purpose of acquisition of machinery, imported equipment and services for the construction of Angra 3 Thermonuclear Power Plant belonging to Eletronuclear, with the following characteristics: Amortization System – SAC (Constant Amortization System), Grace period – 5 years, Amortization – 20 years, Nominal interest – 6.5% p.a., Guarantee – Federal Government." The December 27, 2012 Form 6-K was signed by Defendant Araújo.

196. These statements were materially false and misleading when made, and were known or deliberately disregarded as such by Defendants, because Defendants failed to disclose that the Angra 3 construction costs were significantly impacted by the bribery scheme..

197. On March 28, 2013, the Company filed a Form 6-K with the SEC announcing that the Board of Directors approved the "Eletrobras Business and Management Master Plan for the period 2013 to 2017." The March 28, 2013 Form 6-K was signed by Defendant Araújo, and stated as follows:

> The master plan includes the strategic realignment of Eletrobras, establishing conditions for managing and obtaining revenue through the optimization of expenditures, synergies inherent to the integrated activities of the Eletrobras companies, corporate and organizational restructuring, improvements in management processes and a strict focus on expansion, which provides investments and better performance for the company.
>
> * * *
>
> The Executive Board of Directors of Eletrobras established measures, in line with the strategic plan, namely: . . . immediate creation of the Eletrobras Executive Committee for supervision and monitoring of the Angra 3 project[.]

198. These statements were materially false and misleading because Defendants failed to disclose that Angra 3 costs and developments were significantly impacted by the bribery scheme.

199. On May 1, 2013, the Company filed its 2012 Annual Report, which states with respect to Angra 3 that the "cost of its construction will be approximately R$13.1 billion."

200. These statements were materially false and misleading because Defendants failed to disclose that the Angra 3 construction costs were significantly impacted by the bribery scheme.

201. On May 17, 2013, during a conference call to discuss the Company's first quarter 2013 financial results, in response to an analyst who asked about the news in the press regarding Belo Monte's higher budget and what the expected return would be, Defendant Araújo stated as follows:

> And now, we have the problem of the group of assets that is going to be operated and kept. And we are going to earn through this asset. So we have to be very responsible in the execution of our project because now we have to be sure of the profitability of the business. We have worked with this premise already. . . .I cannot

> answer the question, by the way, but we think that we are not in -- taking on any additional costs.
>
> * * *
>
> We are not going to take on any additional costs without analyzing things that - through a process of negotiation, there is within the provision of the structuring project of this nature.

202. These statements were materially false and misleading because Defendants failed to disclose that the projects' contract costs and negotiations were impacted by the illicit bribery scheme.

203. On or about February 12, 2014, Eletrobras reportedly issued a statement that it had awarded contracts worth approximately $1.5 billion U.S. dollars or R$2.9 billion for Angra 3 primary and secondary systems. The Company's statement was reported as follows in the news:

> The company said in a statement the contracts, awarded to two consortiums of construction and engineering companies, were the largest remaining to be awarded as part of the project to complete the unfinished unit in the state of Rio de Janeiro.
>
> The work was divided into two separate contracts, one for electro-mechanical assembly associated with the reactor's primary system and another for the secondary-side work.
>
> A group comprising conglomerate Queiroz Galvao and the companies EBE and Techint was awarded the primary loop work while a consortium of Brazilian companies led by construction company Andrade Guitierrez was awarded the secondary-side contract, Eletrobras Eletronuclear said.

204. These statements were materially false and misleading because Defendants failed to disclose that the Angra 3 contracts were awarded to pre-selected members of a cartel based on agreements to pay bribes and kickbacks, and that the costs of the contracts were inflated due to the bribery scheme.

205. On February 27, 2014, Eletrobras filed a 6-K announcing an investment budget of R$13.944 billion for 2014, which included R$2.973 billion in the generation segment of the Company.

206. These statements were materially false and misleading because Defendants failed to disclose that the costs of generation investments was materially inflated by the bribery scheme.

207. On April 1, 2014, the Company filed a 6-K for its Marketletter, which stated the following about the Company's expenditures in the construction of new power plants:

> With regards to the Generation segment R$6 billion were invested. The construction of important new power plants went forward steadily with the Company's partnership. As for Corporate investments, we highlight the R$ 1.5 billion investment in the Angra III Thermal Nuclear Power Plant, the R$0.6 billion in the Mauá 3 Thermal Power Plant. We also must highlight investments in partnership, such as R$ 0.9 billion in Belo Monte Power Plant, R$1.0 billion in Jirau Power Plant, R$ 0.4 billion in Teles Pires Power Plant and R$ 0.7 billion in Santo Antonio Power Plant.

208. These statements were materially false and misleading because Defendants failed to disclose that the costs of generation investments, including those in Angra 3, Belo Monte, Jirau, Teles Pires, and Santo Antonio, were materially inflated by the bribery scheme.

209. On April 30, 2014, the Company filed its 2013 Annual Report, in which Eletrobras disclosed the risk that "[c]onstruction, expansion and operation of our electricity generation, transmission and distribution facilities and equipment involve significant risks that could lead to lost revenues or increased expenses." The Company noted as examples that "we experienced work stoppages during the construction of our Jirau, Santo Antônio hydroelectric plants and the Belo Monte which is a plant we own through a joint-venture." Among the issues that could arise related to this risk, the Company noted: the inability to obtain required governmental permits and approvals; work stoppages; and construction and operational delays, or unanticipated cost overruns.

210. These statements were materially false and misleading because Defendants failed to disclose that the bribery scheme impacted the costs and could lead to delays in the projects.

211. On the topic of the construction of Angra 3, the 2013 Annual Report repeated the construction cost specified in the 2012 Annual Report, at ¶ 199, *supra*. These statements were materially false and misleading for the same reasons set forth in ¶ 200, *supra*.

212. On August 27, 2014, Eletrobras filed a 6-K containing a document titled, "Presentation to Analysts and Investors, August 2014." The August 2014 presentation listed the investment budget and expenditures as of June 2014 (in millions) for the generation segment as follows:

| Investment | June 2014 | |
|---|---|---|
| | Budget | Realized |
| **Generation** | **6,930** | **2,178** |
| Corporate Expansion | 2,973 | 785 |
| SPEs Expansion | 3,091 | 1,247 |
| Maintenance | 866 | 146 |

213. These statements were materially false and misleading because Defendants failed to disclose that the cost of generation investments were materially impacted by the bribery scheme.

214. Additionally, the August 2014 presentation contained a section concerning "Expansion" listing the generation projects under construction as of June 30, 2014 with certain additional information. For Teles Pires, Belo Monte, and Angra 3, anticipated completion dates of January 2015, February 2015, and May 2018, respectively, were shown. Both Santo Antonio and Jirau were indicated as partially operational, without an indication of a date when they were expected to be fully operational.

215. These statements were materially false and misleading because Defendants failed to disclose that the project developments and completion timelines could be impacted or delayed due to the bribery scheme.

216. In a separate 6-K filed by Eletrobras on August 27, 2014 with the Company's second quarter 2014 Marketletter, the Company's investment in Belo Monte was listed as R$29.375 billion fully-built, and $25.885 billion as of April [20]10.

217. These statements were materially false and misleading because Defendants misrepresented and failed to disclose that the costs for Belo Monte were materially impacted by the bribery scheme.

## IX. ADDITIONAL FACTS SUPPORTING AN INFERENCE OF SCIENTER

218. Eletrobras was an active participant in the schemes designed to eliminate any type of competitive bidding process and award contracts to those paying bribes to Company executives and political party officials. Testimony given by multiple contractors who participated in the scheme, as well as documents uncovered in Operation Car Wash and Operation Radioactivity, demonstrate that top officials at the Company were not only aware of, but explicitly directed, the payment of bribes in exchange for the award of contracts to construct the dams and nuclear plant discussed herein. Additionally, Defendants used debt offerings and acquisitions throughout the Class Period to paint Eletrobras as a fast-growing industry leader with excellent financial prospects, and mask the widespread corruption that was impacting the Company's financial performance. Thus, Defendants knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading in violation of the federal securities laws.

### A. The Bribery Scheme Reached the Highest Levels of Executives at Eletrobras, Supporting an Inference of Corporate Scienter

219. As revealed by documents and testimony provided in the ongoing Operation Car Wash, the bribery scheme at Eletrobras was conducted by the Company's top executives, including, among others:

- Valter Luiz Cardeal de Souza, Eletrobras' Chief of Generation, who is purportedly a close, personal friend of President Rousseff's and her "man in the electrical sector," and who demanded kickbacks be paid to the Workers' Party in the amount of four percent of the R$2.9 billion contracts most recently awarded for work on Angra 3;

- Othon Luiz Pinheiro da Silva, the former CEO of Eletronuclear, who has been arrested and indicted for allegedly personally accepting R$4.5 million in bribes in connection with Angra 3 using a shell consulting company he set up to accept the illicit payments;

- Adhemar Palocci,[14] Eletronorte's Director of Planning and Engineering, who has been identified in sworn testimony as being involved in the bribery scheme related to the Belo Monte dam project; and

- Winter Andrade Coelho, Eletronorte's Assistant Director of Operations, who was arrested in connection with Operation Electroshock in April 2015 for allegedly accepting bribes from engineering and information technology companies.

### 1. Angra 3 and Eletronuclear

220. As reported by *Veja* in the July 15, 2015 article entitled, "Getting closer: whistleblowers accuse 'Dilma's man in the electrical sector' of negotiating payments of kickbacks to the Workers' Party during the presidential election of 2014,"[15] testimony by Ricardo Pessoa, the CEO of UTC Engineering, provided detailed information regarding the central roles played by Defendant Cardeal and Pinheiro in the bid-rigging and bribery scheme carried out in connection with contracts for Angra 3. According to Pessoa, on or about September 2014, a cartel of construction companies dubbed "Una 3" closed on contracts valued at R$2.9 billion to construct part of the Angra 3 nuclear plant. In the final negotiations, Eletrobras sought a ten percent discount from the cartel, and the cartel ultimately agreed to a six percent discount. After that, Pessoa

[14] Adhemar Palocci's brother, Antonio Palocci Filho, is also being investigated in connection with Operation Car Wash. Antonio allegedly demanded Petrobras pay a kickback to President Rousseff's election campaign. He had served as Rousseff's chief of staff until 2011, and was elected to the Petrobras Board of Directors in April 2011, but resigned in June 2011.

[15] Although the official publication date of the article is July 15, 2015, the article, in fact, began circulating several days earlier. It is expressly referenced by Cardeal in a recorded conversation he had on July 11, 2015, and is also referenced in a Form 6-K filed by Eletrobras on July 14, 2015.

testified that Cardeal called the officers of the Una 3 cartel and instructed them that they must pay to the Workers' Party the four percent difference between the discount requested and the discount accepted. Cardeal also purportedly talked to the finance director of UTC Engineering, Walmir Pinheiro, to discuss further details of the kickback payment, and contacted Joao Vaccari, then treasurer of the Workers' Party, to inform him of the arrangements for the four percent kickback.

221. After Pessoa's testimony was published in the July 2015 *Veja* article, Cardeal called Eletronuclear's former CEO, Pinheiro, concerned about the repercussions of the bribery accusations and seeking to get "on the same page . . . so we can help each other out[.]" As reported in an October 8, 2015 article in *Estadao* titled "Phone Bug from the federal police indicates agreement between executives of Eletros against Car Wash," a telephone call made by Cardeal to Pinheiro on July 11, 2015, prior to Pinheiro's arrest, lasted seven minutes and 44 seconds, and was captured in its entirety by a recording device placed on Pinheiro's line as part of Operation Radioactivity. In the call, Cardeal summarized—in an excited, expletive-laden manner—the content of Pessoa's testimony. Cardeal asked Pinheiro for a copy of a letter Pinheiro previously released in response to the bribery allegations "so I can be on the same page as you." Additionally, Cardeal mentioned that he was "in contact with the government to see what we can do to fix our lives," noting that there were criminal ramifications to the bribery charges.

222. Pessoa's testimony is also corroborated by the testimony of Dalton Avancini, CEO of Camargo Correa, which also was a member of the cartel awarded construction contracts for Angra 3. According to Avancini, Eletronuclear directed the pre-qualification process to ensure that only the cartel members would be approved to bid on the Angra 3 work. Initially, the construction companies were divided into two cartels, Una 3 and Angra 3, but this was just for appearances; they agreed upon which cartel would win each contract, and submitted bids in

accordance with that agreement. After the results of the bidding process were announced, the cartels merged, and the six percent discount they negotiated was applied. At this point, around August 2014, Avancini was informed at a meeting with the other cartel members of the agreement to pay kickbacks to employees of Eletronuclear, including Pinheiro, as well as a kickback to the PMDB.

223. Avancini further testified that the same cartel members had been involved in the construction of the Angra 1 and Angra 2 plants, and that he believed that the same bidding and bribery process was applied in connection with the award of those contracts. Further to these statements, documents and testimony cited in the criminal complaint against Pinheiro provide evidence that 24 contracts with Eletronuclear in the period from June 25, 2007 through August 5, 2015—including the Angra 3 contracts—were the subject of bribes and bid-rigging by Pinheiro who, at times, funneled the illicit money through a sham consulting company he created with his daughter. With respect to Angra 3, the complaint states that it was Pinheiro who inserted clauses in the prequalification process in order to exclude all but the cartel members from bidding, and that Pinheiro dictated the bidding strategy to the cartels, as evidenced by emails produced by Camargo Correa.

### 2. Belo Monte and Eletronorte

224. In addition to testifying about the bribes involved in the award of Angra 3 contracts, Avancini testified that a similar bribery scheme existed in connection with the contract awarded for Belo Monte. Specifically, he stated that there was a cartel of ten companies, of which Camargo Correa was a member, and that at the time they entered the cartel, they were informed of a commitment to pay to the PMDB an amount equal to one percent of the approximately R$133 million contract for the Belo Monte project. The kickback was to be paid by cartel members in

the same proportion as their participation in the contract. Thus, for Camargo Correa's 15% of the contract, it owed approximate R$20 million to the PMDB under this arrangement. Avancini further testified that Adehmar Palocci, Eletronorte's Director of Planning and Engineering, was involved in the bribery scheme, and that he believed accounting for the payments was handled in a similar manner as done in Petrobras through negotiations with Julio Camargo (a businessman and purported money launderer) and Eduardo Leite (an executive of Camargo Correa, who has also testified under a whistleblower agreement in connection with Operation Car Wash).

### B. The Scope of the Company's Relationships With Indicted Construction Companies Supports An Inference of Corporate Scienter

225. Eletrobras' extensive relationships with the contractors indicted in Car Wash supports an inference that the kickback scheme was endemic to the Company, and therefore, top Company executives knew or recklessly disregarded evidence of the scheme.

226. First, as set forth above at ¶¶ 56, 62, 65, and 180, several of the indicted contractors are joint venture partners with the Company in certain SPEs which were established to operate or perform other functions related to the projects alleged herein. Such indicted contractors include Andrade Gutierrez S.A. (a partner in MESA, Estacao Transmissora de Energia S.A., and Norte Brasil Transmissora de Energia S.A.); Camargo Correa S.A. (a partner in ESBR); Norberto Odebrecht S.A. (a partner in Cia. Hidreletrica Teles Pires S.A. and MESA); and Engevix Engenharia S.A. (a partner in MGE Transmissao S.A. and Goias Transmissao S.A.).

227. Additionally, the extent of the contracts between Eletrobras and the indicted construction companies is massive. For example, looking at only the then-active contracts, an article published by *UOL News* on December 22, 2014 entitled, "Contractors involved in Car Wash have R$6.2 bi in contracts with electrical companies," found the following contracts between Eletrobras and the construction companies indicted in Operation Car Wash:

**<u>Eletronuclear</u>**

- R$ 1,646,957,249.44
  Andrade Gutierrez S.A, Camargo Corrêa S.A, Norberto Odebrecht S.A and UTC
- R$ 1,439,074,531.38
  Construtora Andrade Gutierrez S.A
- R$ 1,287,733,164.14
  Queiroz Galvão S.A,
- R$ 109,098,115.07
  Engevix Engenharia S.A
- R$ 108,985,056.10
  Engevix Engenharia S.A
- R$ 32,192,319.32
  Construtora Norberto Odebrecht S.A
- R$ 16,957,146.40
  Engevix Engenharia S.A
- R$ 11,305,663.41
  Engevix Engenharia S.A
- R$ 2,288,791.70
  Engevix Engenharia S.A

**Subtotal: R$ 4,654,592,036.96**

**<u>Eletronorte</u>**

- R$ 16,555,675.18
  Engevix Engenharia S.A
- R$ 15,333,575.15
  Engevix Engenharia S.A

**Subtotal: R$ 31,889,250.33**

**<u>Furnas</u>**

- R$ 406,231,523.88
  Norberto Odebrecht S.A and Engevix Engenharia S.A
- R$ 76,833,275.94
  Engevix Engenharia S.A

**Subtotal: R$ 483,064,799.82**

**<u>Amazonas Energia</u>**

- R$ 930,595,810.00
  Andrade Gutierrez S.A
- R$ 102,227,257.00
  Andrade Gutierrez S.A
- R$ 31,418,600.29
  Engevix Engenharia S.A

**Subtotal: R$ 1,064,241,667.29**

228. These contracts represented an overwhelming majority of the Company's expenditures for capital projects in 2014. Indeed, the R$6.2 billion of then-active contracts with cartel members cited above is roughly ***equal*** to the Company's average annual capital expenditures of R$6.3 billion company-wide during the Class Period, as set forth in its filing with the CVM for the year ended December 31, 2014.

229. Thus, the Company's extensive relationships with the indicted contractors—which spans numerous Eletrobras subsidiaries and projects, both as partners and contractors, over the course of many years—supports an inference that the bribery scheme involving those contractors was widely known within the Company.

**C. Eletrobras' Debt Offering Supports an Inference of Scienter**

230. The Company was motivated throughout the Class Period to inflate its assets and earnings reports in order to ensure that the Company could secure the financing needed to fund construction projects in furtherance of the bribery scheme. According to the Company's 2010 Annual Report, "[Eletrobras'] principal sources of liquidity derive from the cash generated by our operations ***and from loans received from various sources***…". Substantially similar statements appeared in the Company's Form(s) 20-F for its 2011, 2012, and 2013 Fiscal Years.[16] In connection therewith, Defendants made a long-term debt offering in October 2011 worth over $1.75 billion in U.S. dollars. This offering enabled Defendants to fund construction projects in furtherance of the bribery scheme. Had investors and rating agencies known the Company's true financial condition, the Company would have had grave difficulty consummating the note offering in furtherance of the scheme.

---

[16] As of this writing, Eletrobras still has not released its Form 20-F for the Fiscal Year ended December 31, 2014.

231. Defendants used the debt offering to paint the Company as legitimately expanding and prosperous as opposed to growing as a result of the corruption scheme alleged herein. In its Form 6-K dated August 24, 2012, for instance, the Company touted its October 2011 Class Period debt offering and directly and misleadingly linked it to Eletrobras' overall legitimate value, stating: "In the largest transaction ever undertaken by Eletrobras in the bond market, we issued a US$ 1.75 billion bond, ***which confirms our entrepreneurial strength***. Our brand, recently transformed, was valued at US$ 2.5 billion and is among the most valuable of the country. We were also listed for the fifth consecutive time in the corporate sustainability index of the São Paulo Stock Exchange (Bovespa - ISE)."

232. The Company also acknowledged that the October 2011 debt financing would be used to expand operations. In its 2011 Annual Report, Eletrobras asserted it was "bidding in auctions for new transmission lines and new generation contracts. In the event that we are successful in any of these auctions, we will need additional cash to fund investments necessary to expand the applicable operations."

233. Had the Company's true financial condition and involvement in the corruption scheme been known, Defendants would have had significant difficulty raising the funds needed to pay for further construction. Indeed, in July 2015, Moody's downgraded the Company's $1.75 billion senior unsecured bonds due October 2021, in relevant part, stating that:

> The negative outlook reflects the uncertainties arising from potential energy rationing due to the current hydrological crisis should it continue well into 2016, which would lead to a further deterioration in the company's credit metrics; ***the failure of the company to file its 20F*** with the United States Securities Exchange Commission (SEC) which prompted a qualified opinion from its auditor KMPG with its 1st quarter financial results; ***the outcome of the investigation on potential bribery payments to the former CEO of the Eletronuclear subsidiary; delays and further potential cost overruns in connection with the company's new nuclear plant construction; and the company's need to raise additional funding on a***

> ***timely and adequate basis to fund the balance of its aggressive capital expenditure program*.**

234. Thus, the Company's inflated financials enabled Defendants to raise funds to expand Eletrobras' operations and pay for construction projects in furtherance of the bribery scheme.

## X. THE TRUTH IS REVEALED IN A SERIES OF PARTIAL DISCLOSURES

235. As alleged herein, the market for the Company's publicly-traded securities was open, well-developed and efficient at all relevant times.[17] As a result of Defendants' materially false and misleading statements and disclosure failures as alleged herein, Eletrobras' publicly-traded securities traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired Eletrobras securities relying upon the integrity of the market price of Eletrobras' securities and market information relating to Eletrobras, and have been damaged thereby.

236. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class. At all relevant times, Defendants engaged in a fraudulent course of conduct that artificially inflated Eletrobras' publicly-traded securities and operated as a fraud on Class Period purchasers of Eletrobras securities. Defendants achieved Eletrobras' Class Period façade of success, growth, responsibility and strong future business prospects by: (i) failing to disclose the bribery, kickbacks, and incidents of political corruption that have been exposed through Operation Car Wash; (ii) artificially inflating Eletrobras' net income, understating expenses, misrepresenting the value of fixed assets, including the Belo Monte dam,

---

[17] "Securities" as used herein refers to the Company's ordinary shares that trade under the symbol EBR, its preferred shares that trade under the symbol EBR.B and the Company bonds with maturity dates of 10/27/2021 and 7/30/2019, respectively (the "Notes").

the Santo Antonio Dam, the Jirau Dam, the Teles Pires dam, and the Angra 3 nuclear reactor; and (iii) misstating other key financial information about the Company.

237. Further, Defendants misrepresented the Company's operating conditions, commitment to ethics and corporate responsibility, and financial condition. Defendants' false and misleading statements and material omissions had their intended effect, causing Eletrobras' securities to trade at artificially inflated prices throughout the Class Period, with its common shares reaching as high as ***$16.29*** per ADS on April 8, 2011.

238. The economic loss, *i.e.*, damages, suffered by Plaintiffs and other members of the Class was a direct result of the relevant truth about Defendants' fraudulent scheme being revealed to the market in a series of partial adverse disclosures and third-party reports in the media. When Defendants' prior misrepresentations were disclosed and became apparent, the price of Eletrobras' securities fell as the prior inflation was removed. By the time the market had fully digested these disclosures, shares of Eletrobras' common stock (EBR) closed at $1.27 per ADS on September 11, 2015. Eletrobras' Notes also traded at a fraction of their face values, on September 8, 2015. As a result of their purchases of Eletrobras securities during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

239. Defendants' false and misleading representations and omissions caused and maintained the artificial inflation in Eletrobras' stock price throughout the Class Period until facts about the Company's true financial condition were revealed to the market. The timing and magnitude of Eletrobras' securities price declines, as detailed herein, negate any inference that the loss suffered by Plaintiffs and the Class was caused by changed market conditions or other macroeconomic factors unrelated to Defendants' fraudulent conduct. The market for the

Company's securities promptly digested current information with respect to Eletrobras from all publicly available sources and reflected such information the price of the Company's securities.

240. As described in ¶¶ 241-257, *infra*, these revelations did not happen all at once, but rather were the result of investigation by investors, analysts, rating agencies and journalists.

**A. October 27, 2014 Disclosure Event**

241. On October 24, 2014, the newspaper *Valor Economico* published an article suggesting that Eletrobras was being investigated in connection with Operation Car Wash. The article further suggested that statements had been made to the Federal Police, by Mr. Alberto Youssef, as part of that investigation. In response to the news, on October 27, 2014, the value of the Company ADSs fell to $2.21 per ADS on unusually heavy trading volume of over 4.3 million shares traded which represented a single-day decline of 11.95%. The following day, the Company responded to the article in a Form 6-K filed with the SEC that misleadingly reaffirmed its commitments to its Code of Ethics.

**B. November 2014 Disclosure Events**

242. On Sunday, November 2, 2014, the publication *O Globo,* ran an article titled "After whistleblower agreement, politicians are on the spot with the Supreme Court." The article suggested that depositions given by the ex-director of Petrobras Roberto Costa and Alberto Youssef implicated many politicians and construction companies in the bribery and kickback scheme. The article further suggested that Eletrobras may be investigated in connection with Operation Car Wash. On Monday, November 3, 2014, the value of the Company ADSs closed at $2.41 per ADS on heavy trading volume of 1.9 million shares traded which represented a single-day decline of 4.74%.

243. On November 14 through November 17, 2014, there was wide reporting in the Brazilian press regarding arrests by the Brazilian Federal Police of construction company executives implicated in Operation Car Wash. Reporting concerning these events noted that Eletrobras had business ties with many of the arrested executives. Additionally, on November 17, 2014, Eletrobras announced its third quarter 2014 results, which were negatively impacted by a material charge to earnings of R$1.225 billion due to a reduction in the carrying value of their investments in SPEs. Eletrobras' ADSs dropped by 6.88% to close at $2.03 on November 17, 2014. Brazilian media attributed the drop to both the poor third quarter results and investors' fears that Eletrobras was involved in the same bribery scheme as was revealed at Petrobras.

**C. February 10, 2015 Disclosure Event**

244. On February 10, 2015, before the market opened for trading, Eletrobras disclosed in a Form 6-K filing with the SEC (the "February 10, 2015 Form 6-K") the translation of an article in the Brazilian magazine Veja alleging that after PwC refused to sign Eletrobras' financial statements without provisions related to corruption measures, Eletrobras brought in KPMG as its independent auditor. Specifically, the February 10, 2015 Form 6-K signed by Defendant Araújo states as follows:

> In response to Oficio CVM/SEP/GEA-1/Nº 032/2015, transcribed below, we hereby informe [sic] our shareholders and the market in general that Eletrobras, until this date, was not informed by the independent auditors KPMG ("KPMG") about any fact regard the subject fraud and corruption that may have effect or result in delays of the filing and disclosure of its financial statements for the year ended December 31, 2014, as well as the Company, through its internal controls and compliance program, did not identify the existence of any episode of fraud and corruption in its projects.
>
> KPMG has been performing normally in the Company's accounting audit procedures in accordance with Brazilian and international auditing standards, including those set out in NBC TA 240 approved by the Brazilian Federal Accounting Council. For this reason Eletrobras clarifies that the information disclosed by the magazine Veja does not correspond to the reality of the work being done at this time, to completion of the Financial Statements for the year 2014, whose

date for disclosure to the market remains scheduled for March 27, 2015. The Company is available, through its investor relations area, to provide any clarification regarding this announcement.

OFÍCIO/CVM/SEP/GEA-1/N.º 032/2015

Subject: Clarification request

Dear CFO,

We refer to the article published on 02.08.2015 in the magazine VEJA, entitled "Corruption Balance", whose contents are transcribed below:

After the PwC had refused to sign the Petrobras financial statements without the provisions related to corruption measures in the Brazilian State Company, now it's KMPG time. The audit company requires that Eletrobras and others electric energy state companies make the provisions in its financial statements regarding the corruption.

About that, we request clarification about the veracity of these claims and, if confirmed, clarify the reasons why the company understood not to disclosure Relevant Fact according to CVM Instruction No. 358/2002.

Furthermore, considering the truth on the news, we request the Company manifestation of internal measures adopted, or to be adopted on the subject.

This clarification shall be sent through the IPE System, at the Market Announcement category, type Clarifications Consultations CVM / BOVESPA, Disclosed News on Media, which shall include the transcription of this letter.

Rio de Janeiro, February 10, 2015.

245. Despite Eletrobras' representations in the Form 6-K that there was no truth to the allegations in the *Veja* article, Eletrobras' ADSs declined by nearly 7% on very heavy trading volume of over 1.2 million shares traded to close at $1.74 per ADS on February 10, 2015.

**D. February 28, 2015 and March 2015 Disclosure Events**

246. Beginning on February 28, 2015 and during the first two weeks in March 2015, reports surfaced that witnesses in Operation Car Wash gave testimony to Brazilian prosecutors with specifics of how bribes and kickbacks to political parties were paid in connection with certain Eletrobras projects.

247. Avancini, the CEO of Brazil's largest construction company, Camargo Corrêa, who was arrested in November 2014 and accused of paying bribes to obtain contracts, reportedly substantiated Eletrobras' involvement in the widespread bribery. In particular, Avancini told prosecutors that Camargo Corrêa paid kickbacks in connection with contracts for the Belo Monte dam project and Angra 3 reactor work.

248. After news began circulating about Avancini's testimony, Eletrobras' ADSs declined by more than 6% on March 2, 2015, and continued to decline for two weeks as more detailed information regarding testimony in Operation Car Wash emerged. In total, from February 28, 2015 through March 12, 2015 as the witnesses testified in the criminal investigations, Eletrobras' ADSs declined every single trading day and lost ***over 19% of their value***, closing at $1.54 per ADS on March 12, 2015.

249. On April 27, 2015, in response to news reports circulating in Brazil that the award of contracts in connection with the construction of Angra 3 was tied to bribery and corruption, Eletrobras' wholly owned subsidiary Eletronuclear issued a statement "strongly rejecting" the claims, and asserting that the bidding process had been fair. On April 27-28, 2015, Eletrobras' ADSs increased in price by about 5.9% to close at $2.67 per ADS on April 28, 2015.

**E. April 30 & May 13, 2015 Disclosure Events**

250. On April 30, 2015, in a Form 12b-25 filing with the SEC, the Company announced that it would not be able to timely file its Form 20-F annual report for the year ended December 31, 2014. The new filing deadline for the 2014 Form 20-F was May 15, 2015. The reasons for the delay were given as follows:

> The statutory auditor of Energia Sustentável do Brasil Participações S.A. ("Jirau"), which is a significant affiliate of Centrais Elétricas Brasileiras S.A. – ELETROBRAS (the "Company") under Rule 3-09 of Regulation S-X, recently informed us that it did not consider itself independent under the relevant U.S.

> independence rules. Consequently, the Company has appointed another audit firm to audit the financial statements of Jirau for purposes of applying equity method accounting to the Company's consolidated financial statements. Accordingly, the Company will wait for the conclusion of the audit process for Jirau before finalizing its Form 20-F as of and for the year ended December 31, 2014.
>
> In addition, the Company recently became aware of press reports stating that the former CEO of Camargo Corrêa allegedly stated in his testimony in relation to Operação Lava-Jato (Operation Car Wash) that the consortium of companies bidding for the mechanical assembly of the Angra 3 power plant allegedly made illegal payments to the CEO of our wholly owned subsidiary, Eletrobras Thermonuclear S.A. – Eletronuclear ("Eletronuclear"). The CEO of Eletronuclear has requested leave of absence. The internal committee established by the Company to investigate any allegations made in the press in relation to Operação Lava-Jato (Operation Car Wash) has not yet concluded its internal investigation and the Company's Board of Directors, to which such internal committee reports, has provided authorization for the Company to take all necessary measures to engage a specialized independent firm to conduct an external investigation into these allegations. Accordingly, the Company is unable to file its Form 20-F as of and for the year ended December 31, 2014 by April 30, 2015.

251. The Company further stated that the CEO of Eletronuclear, Pinheiro, had taken leave of absence amidst allegations of corruption in connection with Operation Car Wash. Responding to this new, ominous information about the Company, its ADS's fell 8.24% on a single-day on over 1.3 million shares traded to close at $2.45 per ADS. The Company's $1 billion bond issued on 7/30/2009 with a maturity date of 7/30/2019 also fell $4.85 in a single day on April 30, 2015. The following day, on May 1, 2015, shares of the Company's stock fell an additional 3.27% as investors continued to digest these new, damaging revelations.

252. On speculation that the Company would again be unable to file its Form 20-F, the Company's share price fell 10.11% on heavy trading volume of over 1.7 million shares on May 13, 2015. The following day, the Company filed a Form 6-K confirming that it would not be able to file its Form 20-F for the fiscal year ended December 31, 2014 by the extended May 15, 2015 deadline. The Company's stated reasons for the delay were substantially similar to those stated in its earlier filings on April 30, 2015:

> …the statutory auditor of [Jirau]…did not consider itself independent under the relevant U.S. independence rules and, consequently, we appointed another audit firm to audit the financial statements of Jirau for purposes of applying equity method accounting to our consolidated financial statements. In addition, the delay was also caused by the fact that we recently became aware of press reports stating that the former CEO of Camargo Corrêa allegedly stated in his testimony in relation to *Operação Lava-Jato* (Operation Car Wash) that the consortium of companies bidding for the mechanical assembly of the Angra 3 power plant allegedly made payments to the CEO of our subsidiary, Eletrobras Thermonuclear S.A. – Eletronuclear.We are currently in the process of engaging a specialized independent firm to conduct an external investigation into these allegations.

Through the Form 6-K, the CFO and Investor Relations Officer Armando Casado de Araujo also stated, "At this time, we are unable to provide a specific date by which we will file our 2014 20-F. Our management is committed to filing our 2014 20-F as soon as possible."

253. On May 21, 2015, the rating agency Moody's downgraded Eletrobras' rating from Baa3 to Ba1, warning that additional downgrades may be forthcoming.[18] According to Moody's statement, in addition to the Company's "weak" credit metrics, its decision to downgrade Eletrobras was justified because:

> …Eletrobras received a qualified opinion from its auditor KMPG with its first-quarter results and failed to file its 20F form as required by the United States Securities Exchange Commission. It is Moody's understanding that Eletrobras has complied with the SEC's policy by having contacted the SEC and issued a press release disclosing the occurrence of the filing delinquency and the reason for the delinquency which grants the company a six-month period to cure the delinquency starting from April 30, 2015.
>
> Eletrobras' rationale for not filing the 20F form was that the company needs to obtain further results from the investigation on alleged bribes involving the former CEO of its subsidiary Eletronuclear as communicated in the local media. Eletrobras has stated that it will hire an independent entity to conclude an investigation process

[18] In fact, subsequently Moody's did downgrade the Company further from Ba1 to Ba2 on July 2, 2015. The reasons for the downgrade included: the failure of the company to file its 20F with the SEC which prompted a qualified opinion from its auditor KMPG with its 1st quarter financial results; the outcome of the investigation on potential bribery payments to the former CEO of the Eletronuclear subsidiary; delays and further potential cost overruns in connection with the company's new nuclear plant construction; and the company's need to raise additional funding on a timely and adequate basis to fund the balance of its aggressive capital expenditure program.

> and ensure transparency and independence as required by Brazilian and US laws. KPMG reviewed Eletrobras' 2015 first quarter financial statements and issued a qualified opinion stating that it cannot determine the impact, if any, from the resolution of the expected investigation as it is in the early stage of the process.

The price for EBR slid an additional 2.67% on a single day of trading to close at $2.19 per ADS in response to the downgrade.

254. On June 10, 2015, Eletrobras disclosed in an SEC filing that day that it had hired the international law firm of Hogans Lovells to evaluate irregularities that violated the U.S. Foreign Corrupt Practices Act, the Brazilian Anti-Corruption Law No. 12,846/2013 and the Code of Ethics of Eletrobras Companies with respect to Eletrobras' relationship with the companies mentioned in Operation Car Wash.

**F. June 25, 2015 Disclosure Event**

255. On June 25, 2015, the last day of the Class Period, Bloomberg reported that certain asset sales planned by Eletrobras had been stalled in the midst of the ongoing bribery investigations. In response to this news, the value of Eletrobras' ADSs fell to $1.87 per ADS, a decline of 5% on June 25, 2015.

256. Similarly, throughout the same time period described in ¶¶ 241-255, *supra*, Eletrobras' Notes declined precipitously as the inflation in the Notes was removed as Defendants' fraud became apparent.

**G. Post-Class Period Disclosure Events**

257. Further developments have continued to emerge since the end of the Class Period demonstrating Eletrobras' payment of bribes and political kickbacks in connection with the award of the Angra 3, Belo Monte and Jirau construction projects. For example, in a Form 6-K SEC filing dated July 13, 2015 the Company reported that it had received a letter from the CVM "requesting clarification regarding news published by the newspaper 'Folha de São Paulo', entitled 'Building

Contractor accuses officer of Eletrobras'…." According to Eletrobras' translation, the content of the article is as follows:

> The businessman Ricardo Pessoa told prosecutors of Operation Lava Jato that an officer of Eletrobras, Valter Luiz Cardeal suggested that he give to PT part of what he expected to win in a state company contract to build the nuclear power plant Angra 3, according to the edition of the "Veja" magazine that began circulating on Saturday [July 11, 2015]. [...]
>
> The estimated cost for the construction of Angra 3 is R$ 3.2 billion. According to the report of Mr. Pessoa obtained by the magazine, Eletrobras asked for a 10% discount in the amount charged by the contractor consortium, which accepted a 6% rebate. Closed the contract, Cardeal tell the contractors that the difference should be transferred to the PT in the form of election donations.
>
> According to the report reproduced by the magazine, Pessoa said that the suggestion was made at the end of last year. The contractor said that soon thereafter was approached by the then treasurer of the PT, John Vaccari, currently arrested in Curitiba, to make payment of the election donations to PT.
>
> One of the former executives of Camargo Corrêa who has cooperated with the investigations in February, Dalton Avancini, told prosecutors of the Lava Jato that he paid bribes in 2011 to the former Minister of Mines and Energy, Senator Edison Lobão (PMDB Case MA) to obtain facilities in the construction of the hydroelectric plant of Belo Monte and works of Angra 3.

258. As reported by the *Wall Street Journal* on July 28, 2015, Eletronuclear CEO Pinheiro was subsequently arrested by Brazilian authorities on corruption charges. Finally, on September 11, 2015, the Company filed a Market Announcement with the SEC on Form 6-K announcing that "on September 10th, 2015, Standard & Poor's credit rating agency downgraded the Company's corporate credit rating to BB+ on a global scale and BBB- on a national scale, both with a negative outlook."

## XI. FRAUD ON THE MARKET

259. At all relevant times, the market for Eletrobras' securities was an efficient market for the following reasons, among others:

(a) The Company's securities were actively traded in a highly efficient market;

(b) As a regulated issuer, the Company filed periodic public reports with the SEC;

(c) The Company was covered regularly by securities analysts; and

(d) The Company regularly issued press releases which were carried by national news wires. Each of these releases was publicly available and entered the public marketplace.

260. As a result, the market for the Company's securities promptly digested current information with respect to Eletrobras from all publicly available sources and reflected such information in the price of the Company's securities. Under these circumstances, all purchasers of the Company's securities during the Class Period suffered similar injury through their purchase of the securities of Eletrobras at artificially inflated prices and a presumption of reliance applies.

## XII. NO SAFE HARBOR

261. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Eletrobras who knew that those statements were false when made.

## XIII. COUNT I

**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5**
**Against Defendants Eletrobras, Lopes, Carvalho, and Araújo**

262. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

263. During the Class Period, Eletrobras, Lopes, Carvalho, and Araújo disseminated or approved the false statements specified above, which they knew or recklessly disregarded were materially false and misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

264. Eletrobras, Lopes, Carvalho, and Araújo violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

- Employed devices, schemes and artifices to defraud;
- Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; or
- Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Eletrobras securities during the Class Period.

265. Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Eletrobras' publicly traded securities. Plaintiffs and the Class would not have purchased Eletrobras securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by the Defendants' misleading statements.

266. As a direct and proximate result of the wrongful conduct of Eletrobras, Lopes, Carvalho, and Araújo, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Eletrobras securities during the Class Period.

## XIV. COUNT II

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) & (c) Against All Defendants

267. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

268. During the Class Period, Defendants violated Rules 10b-5(a) and (c) in that they employed devices, schemes and artifices to defraud and engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Eletrobras securities during the Class Period as alleged herein.

269. During the Class Period, Defendants participated in the preparation of and/or disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

270. Defendants made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Defendants individually and together, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about the business, operations and future prospects of Eletrobras as specified herein.

271. Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants' misconduct was engaged in knowingly or with reckless disregard for the truth, and for the purpose and effect of concealing Eletrobras' true financial condition from the investing public and supporting the artificially inflated price of Eletrobras securities.

272. Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Eletrobras securities. Plaintiffs and the Class would not have purchased Eletrobras securities at the prices they paid, or at all, had they been aware that the market prices for the securities had been artificially inflated by the materially false and misleading statements and omissions alleged herein.

## XV. COUNT III

**For Violation of Section 20(a) of the Exchange Act**
**Against the Insider Defendants**

273. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

274. The Insider Defendants acted as controlling persons of Eletrobras within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, participation in and/or awareness of the Company's operations and/or intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Insider Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Insider Defendants were provided with, or had unlimited access to copies of, the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading

prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

275. In particular, the Insider Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

276. As set forth above, Eletrobras and the Insider Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions, each as a controlling person, the Insider Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Eletrobras' and the Insider Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XVI. PRAYER FOR RELIEF

277. WHEREFORE, Plaintiffs pray for judgment as follows: declaring this action to be a proper class action; awarding rescission and/or damages, including interest; awarding reasonable costs, including attorneys' fees; and such equitable/injunctive relief as the Court may deem proper.

## XVII. JURY DEMAND

278. Plaintiffs demand a trial by jury.

Dated: December 8, 2015

/s/ *Frederic S. Fox*
**KAPLAN FOX & KILSHEIMER LLP**
Frederic S. Fox
Donald R. Hall
Melinda Campbell
Jason Uris
850 Third Avenue, 14th Floor
New York, NY 10022

Telephone: (212) 687-1980
Facsimile: (212) 687-7714

*Co-Lead Counsel for the Class*

**KAHN SWICK & FOTI, LLP**

/s/ *Ramzi Abadou*

Ramzi Abadou (admitted *pro hac vice*)
912 Cole Street, # 251
San Francisco, CA 94117
Telephone: 504-455-1400
Facsimile: 504-455-1498

-and-

**KAHN SWICK & FOTI, LLC**
Lewis S. Kahn
Alexander Burns
406 Covington Street
Madisonville, LA 70447
Telephone: 504-455-1400
Facsimile: 504-455-1498

*Co-Lead Counsel for the Class*

**CERTIFICATE OF SERVICE**

I, Frederic S. Fox, hereby certify that, on December 8, 2015, I caused the foregoing to be served on all counsel of record by filing the same with the Court using the CM\ECF system which will send electronic notices of the filing to all counsel of record.

*/s/ Frederic S. Fox*
Frederic S. Fox