UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
────────────────────────────────

IN RE ELETROBRAS SECURITIES
LITIGATION                                    15-cv-5754 (JGK)

────────────────────────────────          OPINION AND ORDER

JOHN G. KOELTL, District Judge:

    This is a consolidated securities action purportedly
brought on behalf of a class of all purchasers of U.S. exchange-
traded securities of Centrais Elétricas Brasileiras S.A.
("Eletrobras" or the "Company") between August 17, 2010 and June
24, 2015 (the "class period"). The lead plaintiffs, the City of
Providence and Dominique Lavoie (the "plaintiffs") filed a
Second Amended Complaint ("SAC") on February 26, 2016. The
plaintiffs asserted violations of Section 10(b) of the
Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (the
"Exchange Act"), and Rule 10b-5 promulgated thereunder, 17
C.F.R. § 240.10b-5, against Eletrobras and four senior
executives of the Company, namely, José Antonio Muniz Lopes
("Lopes"), José da Costa Carvalho Neto ("Carvalho"), Armando
Casado de Araújo ("Araújo"), and Valter Luiz Cardeal de Souza
("Cardeal") (collectively, the "individual defendants").[1] The

───────────────

[1] The plaintiffs claim violations of Rule 10b-5 by Eletrobras,
Lopes, Carvalho, and Araújo, and violations of Rule 10b-5(a) and
(c) by all defendants.  See SAC ¶¶ 292-302.  The defendant
Cardeal has not yet been served in this litigation; the motion

plaintiffs also asserted control person liability under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), against the individual defendants.

The defendants Eletrobras, Lopes, Carvalho, and Araújo now move to dismiss the SAC for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

I.

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the allegations in the complaint are accepted as true, and all reasonable inferences must be drawn in the plaintiffs' favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). A complaint should not be dismissed if the plaintiffs have stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff[s] plead[] factual content that allows the court to draw the reasonable inference that the defendant[s] [are] liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662,

_____

to dismiss is brought only on behalf of the defendants Eletrobras, Lopes, Carvalho, and Araújo.

678 (2009). While factual allegations should be construed in the light most favorable to the plaintiffs, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Id.

A claim under Section 10(b) of the Securities Exchange Act sounds in fraud and must meet the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b). Rule 9(b) requires that the complaint "(1) specify the statements that the plaintiff[s] contend[] were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007). The PSLRA[2] similarly requires that the complaint "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is

_____

[2] The plaintiffs assert claims under Rule 10b-5 based on alleged misrepresentations and omissions and scheme liability claims under Rule 10b-5(a) and (c) apart from specific misrepresentations and omissions.  "Because scheme liability 'does not require an allegation that the defendant[s] made a statement,' claims brought under Rule 10b-5(a) and (c) 'need not comport with Subsection (b)(1) of the PSLRA, which requires that . . . plaintiff[s] set forth each statement alleged to have been misleading, and facts giving rise to this belief.'" Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC, 164 F. Supp. 3d 568, 577 (S.D.N.Y. 2016) (quoting In re Alstom SA Sec. Litig., 406 F. Supp. 2d 433, 474-75 (S.D.N.Y. 2005)).  "Scheme liability claims are, however, subject to the PSLRA pleading standard with respect to scienter."  Menaldi, 164 F. Supp. 3d at 577.

misleading," and it adds the requirement that "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1); ATSI, 493 F.3d at 99.

When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the complaint, documents that the plaintiffs relied on in bringing suit and that are either in the plaintiffs' possession or that the plaintiffs knew of when bringing suit, or matters of which judicial notice may be taken. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002). The Court can take judicial notice of public disclosure documents that must be filed with the SEC and documents that both "bear on the adequacy" of SEC disclosures and are "public disclosure documents required by law." Kramer v. Time Warner, Inc., 937 F.2d 767, 773-74 (2d Cir. 1991); see also Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V., 89 F. Supp. 3d 602, 607-08 (S.D.N.Y. 2015); Silsby v. Icahn, 17 F. Supp. 3d 348, 353-54 (S.D.N.Y. 2014), aff'd sub nom., Lucas v. Icahn, 616 F. App'x 448 (2d Cir. 2015).

II.

A.

The following facts alleged in the SAC are accepted as true for purposes of the defendants' motion to dismiss.

Eletrobras is a state-run energy corporation organized under the laws of Brazil that generates about 35% of Brazil's total electricity.  SAC ¶¶ 27, 41.  The Brazilian government has generally owned a majority of the Company's common shares, giving them the right to appoint seven of the up to ten members of the board of directors.  Id.  Since at least 2002, Eletrobras has sponsored American Depository Shares ("ADSs") representing Eletrobras's common and preferred equity and has listed them on the New York Stock Exchange ("NYSE").  SAC ¶ 29.

The individual defendants are current and former officers of Eletrobras.  Lopes was a government-appointed member of Eletrobras's board of directors from the start of the class period through February 25, 2011, and the board-selected Chief Executive Officer ("CEO") during that period.  SAC ¶ 30. Carvalho replaced Lopes in both roles on February 25, 2011. SAC ¶ 31.  Araújo served as the Chief Financial Officer ("CFO") and the Head of Investor Relations throughout the class period. SAC ¶ 32.  Cardeal served as Eletrobras's Chief Generation Officer throughout the class period.  SAC ¶ 33.

In June 2010, Eletrobras updated and amended its "Code of
Ethics: Ethical Principles and Conduct Commitments" ("Code of
Ethics") and declared that it would be adhered to by all
Eletrobras companies and all Eletrobras employees.  SAC ¶¶ 79-
80.  The Code of Ethics was signed by the President of every
Eletrobras affiliate company, and emphasized that Eletrobras
would "repudiat[e] any manner of fraud and corruption," as well
as "comply[] with Brazilian laws and with the legislation of
countries in which Eletrobras Companies operate."  SAC ¶ 82.
The Code of Ethics further pledged "[t]o make corporate
decisions based on the principles of ethics, transparency,
integrity, loyalty, impersonality, legality and efficiency" and
"[t]o refuse and denounce any form or attempt of corruption,
bribery, kickback and 'backscratching'."  SAC ¶ 84.  The
Company's 2010 annual report asserted that the Code of Ethics
was binding on all Eletrobras employees, and, according to the
plaintiffs, the Code of Ethics was effective throughout the
class period.  SAC ¶ 80-81.

Both Carvalho and Araújo signed Eletrobras's annual reports
on Form 20-F for fiscal years 2009 through 2013, and also signed
Sarbanes Oxley ("SOX") certifications included in each of the
annual reports.  SAC ¶¶ 31-32.  In each annual report from 2010
through 2013, the Company admitted that there were material
weaknesses in the design of its internal controls related to

financial reporting.  SAC ¶¶ 111-19.  The 2010 annual report also included certifications from Carvalho and Araújo stating that they were responsible for establishing, maintaining, and designing disclosure controls.  SAC ¶ 114. In its 2011 annual report, the Company disclosed that eight previously disclosed material weaknesses in internal controls were recurrent, and added that it did not adequately design and maintain controls "with respect to accounting for property, plant and equipment, specifically, to ensure the completeness, accuracy and validation of these acquisitions."  SAC ¶ 120. The 2012 annual report further disclosed that the Company "did not adequately design and maintain effective controls with respect to the impairment calculation of assets."  SAC ¶ 125.  Each annual report from 2010 through 2013 also acknowledged that, despite the issues with internal controls, the financial statements were fairly presented in all material respects.  See SAC ¶¶ 113, 122, 127, 132.

The plaintiffs allege that Eletrobras significantly increased the use of Special Purpose Entities ("SPEs") to conduct its business throughout the class period. See SAC ¶ 46-48.  In 2013, the Company's internal audit unit conducted a special audit that showed an overall need to improve control processes over SPEs, specifically identifying that Eletrobras needed to develop, formalize and adopt a code of ethics with

respect to SPEs, that shareholder agreements with SPEs did not
contain provisions giving Eletrobras unrestricted access to
technical and operational information in its SPEs, and that
Eletrobras failed to require SPE partners to provide
anticorruption statements attesting to no knowledge of unlawful
business activities.  SAC ¶ 248-49.  These concerns were
reiterated in a December 12, 2014 internal audit report that was
allegedly circulated to Eletrobras's board of directors,
including Carvalho; the report concluded that with respect to
SPEs, "corporate management is a black hole and that the company
lacks controls to approve their accounts."  SAC ¶ 249.

In March 2014, a Brazilian criminal money laundering
investigation known as "Operation Car Wash" uncovered evidence
of a bribery scheme related to the state-run oil company,
Petróleo Brasileiro S.A. ("Petrobras").  SAC ¶ 7.  On October
24, 2014, a Brazilian newspaper reported that the investigation
had expanded to include Eletrobras.  SAC ¶ 271.  On October 27,
2014, the value of Eletrobras ADSs fell 11.95%, and the
following day, Eletrobras filed a Form 6-K with the SEC and
issued a press release stating that all Eletrobras companies
"respect the principles set out in its [sic] Code of Ethics,"
and that Eletrobras's corporate governance rules follow the laws
of Brazil and the United States and "are observed by Eletrobras

companies in its [sic] operations, including through the Special Purpose Entities. . . ."  SAC ¶¶ 103, 271.

On November 20, 2014, after media reports indicated that documents relating to an Eletrobras project were discovered in the office of a money-launderer at the center of the Petrobras bribery scandal, then-CEO Carvalho stated that "[w]e have a governance system, management, and internal control[s] that are very strong, and we are always looking to improve them."  SAC ¶ 104.

On February 10, 2015, Eletrobras issued a 6-K, signed by Araújo, denying news reports claiming that the Company's auditor was requiring that Eletrobras include certain provisions related to corruption measures in the Company's financial statements, and stating that "the Company, through its internal controls and compliance program, did not identify the existence of any episode of fraud and corruption in its projects."  SAC ¶ 106. That day, Eletrobras ADSs declined nearly 7%.  SAC ¶ 275.

Beginning on February 28, 2015 and during the first two weeks in March 2015, reports surfaced that construction contracts for Angra 3 -- a thermonuclear reactor operated by wholly owned Eletrobras subsidiary Eletrobras Thermonuclear S.A. ("Eletronuclear") -- may have been tainted by bribery and corruption as part of a scheme allegedly organized and executed

in part by Chief Generation Officer Cardeal.  SAC ¶¶ 12, 44B[3].
Between February 28, 2015 and March 12, 2015, the value of
Eletrobras ADSs declined by over 19%.  SAC ¶ 278.

On April 29, 2015, in response to more news reports about
potential bribery and corruption with the Angra 3 project,
Eletrobras also filed a Form 6-K, signed by Araújo, "reiterating
to its investors the Company's commitment to transparency and
ethic[al] conduct in its business."  SAC ¶ 108.

The Company delayed the filing of its 2014 Form 20-F annual
report, missing the initial April 30, 2015 prescription date,
the extended deadline of May 15, 2015, and a third deadline of
November 18, 2015.  SAC ¶ 19.  On June 10, 2015, Eletrobras
disclosed in an SEC filing that it had hired an international
law firm to conduct an internal investigation related to the
allegations stemming from Operation Car Wash.  SAC ¶ 284.  The
investigation focused primarily on nine different projects that
Eletrobras was involved in either directly through its
subsidiaries or indirectly through investments in SPEs: (1) the
"Angra 3" thermonuclear reactor; (2) the "Belo Monte"
hydroelectric dam; (3) the "Jirau" hydroelectric plant; (4) the
"Santo Antonio" hydroelectric plant; (5) the "Teles Pires"
hydroelectric plant  (6) the "São Manoel" hydroelectric plant;

---

[3] The SAC contains two sets of paragraphs numbered 44-54.  The
Court will cite to paragraphs in the first set with the suffix
"A," and those in the second set with the suffix "B."

(7) the "Mauá 3" thermoelectric plant; (8) the "Tumarín" hydroelectric plant ; and (9) the "Simplício" hydroelectric plant.  SAC ¶ 8, 9, 15, 17.

On October 11, 2016, Eletrobras eventually filed its Form 20-F 2014 and 2015 annual reports.  See Campbell Decl., ECF. No 61, Ex. K, (2014 Annual Report); Ex. L (2015 Annual Report). The reports begin with an "explanatory note" describing the results of the Company's "independent internal investigation" that assessed "violations of the U.S. Foreign Corruption Practice Act (FCPA), the Brazilian Anticorruption Law and the Eletrobras' code of ethics."  Campbell Decl. Ex. K at 1, Ex. L at 1.  It disclosed that a former officer of Eletronuclear was sentenced to 43 years in prison for passive bribery, money laundering, obstruction of justice, tax evasion, and participation in a criminal organization, and that other former officers had been formally charged with corruption, money laundering, and obstruction of justice.  See id.  Eletrobras also disclosed that "[s]ince the start of the investigation, the Company replaced its entire Board of Directors, hired a new CEO and a Compliance Officer, and created an independent Compliance Department to help coordinate compliance across subsidiaries." Id.

The explanatory note also disclosed the results of the internal investigation, stating that for some of Eletrobras's

power generation projects, there was "overpricing related to bribery and bid-rigging (a form of fraud in which a commercial contract is promised to one party even though for the sake of appearance several other parties also present a bid. This practice is illegal in most countries) activities deemed to be of an illicit nature in some contracts, since 2008." Campbell Decl. Ex. K at 2, Ex. L at 2.  It went on to note that "[t]he Independent Investigation discovered bribes used to fund improper payments to political parties, elected officials or other public officials, individual contractor personnel, former personnel of subsidiaries or SPEs of Eletrobras and other individuals involved in bid-rigging."  Id.

Because the Company could not identify the exact timing of these improper payments, Eletrobras determined that the amount of Property Plant and Equipment ("PP&E") improperly capitalized because of overpricing due to illicit bribes or bid-rigging prior to December 31, 2014 would be written off and expensed in the 2014 annual report, while any improperly capitalized amounts for contracts entered into between December 31, 2014 and December 31, 2015 would be written off and expensed in the 2015 annual report.  Campbell Decl. Ex. K at 2-3, Ex. L at 2-3.

As a result, the Company recognized a loss totaling R$[4] 195.1 million in 2014 and R$ 16.0 million in 2015.  Campbell Decl. Ex. K at 3, Ex. L at 3.  The R$ 195.1 million expensed in 2014 represented illicit payments of R$ 129.8 million for the Angra 3 thermonuclear reactor project, R$ 62.7 million for the Mauá 3 thermoelectric plant project, and R$ 2.6 million in illicit payments made for the Simplício hydroelectric plant.  Campbell Decl. Ex. L at F-78; SAC ¶¶ 70, 74.  The R$ 16.0 million expensed in 2015 represented illicit payments of R$ 11.5 million made for the Angra 3 project, and R$ 4.5 million for the Mauá 3 project.  Campbell Decl. Ex. L at F-78.  Eletrobras also recognized a R$ 91.5 million loss in 2014 due to illicit payments for its equity method investments in certain SPEs not controlled by the Company, but did not specify which SPE projects were impacted by payments related to bribery or bid-rigging.  Id.

B.

The plaintiffs assert three claims.  In Count One, the plaintiffs allege violations of Section 10(b) of the Exchange Act and Rule 10b-5 against Eletrobras, Lopes, Carvalho, and Araújo based on alleged misrepresentations and omissions.  In Count Two, the plaintiffs allege violations of Section 10(b) of

---

[4] "R$" denotes the Brazilian Real, the official currency of Brazil.

the Exchange Act and Rule 10b-5(a) and (c) against all defendants based on alleged "scheme liability."  In Count Three, the plaintiffs allege control person liability in violation of Section 20(a) of the Exchange Act against Lopes, Carvalho, Araújo, and Cardeal.

Eletrobras, Lopes, Carvalho, and Araújo now move to dismiss the plaintiffs' claims.

III.

The defendants argue that the named plaintiffs, purchasers of Eletrobras ADSs during the class period, lack standing to bring claims on behalf of purchasers of Eletrobras bonds.  "[I]n a putative class action, a plaintiff has class standing if he plausibly alleges (1) that he personally has suffered some actual . . . injury as a result of the putatively illegal conduct of the defendant, and (2) that such conduct implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants."  NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co., 693 F.3d 145, 162 (2d Cir. 2012) (citation and quotation marks omitted); see also In re Winstar Commc'ns Sec. Litig., 290 F.R.D. 437, 452 (S.D.N.Y. 2013) (concluding that an alleged misstatement in a Form 10-K's unqualified audit letter "implicate[d] the same set of concerns for all investors in [the

14

defendant's] securities, including stocks and bonds, because of their common concern for the company's financial health").

As purchasers of Eletrobras's ADSs during the class period, the named plaintiffs have plausibly pleaded that they suffered some actual injury as a result of the allegedly material misrepresentations in Eletrobras's annual reports, press releases, and public statements in a way that "was broadcast at the same time to all members of the public, prospective shareholders and prospective bondholders alike." Winstar, 290 F.R.D. at 452.

The defendants argue that class standing on behalf of bondholders should be denied because there are fundamental differences between the characteristics of ADSs and bonds. While the accompanying levels of risk between ADSs and bonds do differ, the Second Circuit Court of Appeals has made clear that "varying levels of payment priority [do not] raise such a fundamentally different set of concerns as to defeat class standing." NECA, 693 F.3d at 164 (citation and quotation marks omitted).[5]  Accordingly, the named plaintiffs have class standing

_____

[5] The defendants' reliance on In re Salomon Analyst Level 3 Litigation, 350 F. Supp. 2d 477 (S.D.N.Y. 2004) is misplaced. First, In re Salomon was decided before the Second Circuit Court of Appeals clarified the class standing standard. See NECA, 693 F.3d at 162.  Second, the court in In re Salomon concluded that the named plaintiffs did not have standing to assert claims on behalf of bondholders because the case involved allegations of "fraud perpetrated by means of false statements made by an

to assert claims on behalf of those who purchased Eletrobras bonds during the class period.

IV.

The defendants move to dismiss the claims asserted in Count One for a violation of Section 10(b) and Rule 10b-5 based on alleged misrepresentations and omissions on the grounds that the plaintiffs have failed to allege adequately (1) any material misstatements or omissions with respect to the defendants' statements about Eletrobras's ethics and integrity; (2) any material misstatements or omissions regarding Eletrobras's financial condition; and (3) scienter.

Section 10(b), as effectuated by Rule 10b-5, makes it "unlawful for any person . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). To state a claim under Section 10(b) and Rule 10b-5, the plaintiffs must allege that the defendants, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with

---

equity analyst about the investment quality of a company's equity securities" such that "the injury claimed to bondholders, if cognizable at all, seems fundamentally different than the injury claimed to equity security holders." 350 F. Supp. 2d at 497 (emphasis added). The defendants fail to point to any such equity-specific considerations in this case.

scienter, and that the plaintiffs' reliance on the defendants'
action caused injury to the plaintiffs.  Ganino v. Citizens
Utils. Co._, 228 F.3d 154, 161 (2d Cir. 2000); see also City of
Roseville Employees' Ret. Sys. v. EnergySolutions, Inc._, 814 F.
Supp. 2d 395, 409 (S.D.N.Y. 2011).  An alleged omission of fact
is material if there is "a substantial likelihood that the
disclosure of the omitted fact would have been viewed by the
reasonable investor as having significantly altered the 'total
mix' of information made available." Basic, Inc. v. Levinson,
485 U.S. 224, 231-32 (1988) (internal citation omitted). "Put
another way, a fact is to be considered material if there is a
substantial likelihood that a reasonable person would consider
it important in deciding whether to buy or sell shares of
stock."  Operating Local 649 Annuity Tr. Fund v. Smith Barney
Fund Mgmt. LLC, 595 F.3d 86, 92-93 (2d Cir. 2010) (internal
citation and quotation marks omitted); see also Silsby, 17 F.
Supp. 3d at 358.

    "A[n] omission is actionable under federal securities laws
only when the [defendant] is subject to a duty to disclose the
omitted facts." In re Time Warner Inc. Sec. Litig., 9 F.3d 259,
267 (2d Cir. 1993).  Even though Rule 10b-5 imposes no duty to
disclose all material, nonpublic information, once a party
chooses to speak, it has a "duty to be both accurate and
complete." Caiola v. Citibank, N.A., 295 F.3d 312, 331 (2d Cir.

2002).  "[A]n entirely truthful statement may provide a basis for liability if material omissions related to the content of the statement make it . . . materially misleading." In re Bristol Myers Squibb Co. Sec. Litig., 586 F. Supp. 2d 148, 160 (S.D.N.Y. 2008); see also City of Roseville, 814 F. Supp. 2d at 410.  However, corporations are "not required to disclose a fact merely because a reasonable investor would very much like to know that fact."  In re Optionable Sec. Litig., 577 F. Supp. 2d 681, 692 (S.D.N.Y. 2008) (quoting In re Time Warner, 9 F.3d at 267); see also In re Vivendi, S.A. Sec. Litig., 838 F.3d 223, 239-40 (2d Cir. 2016); In re Bank of Am. AIG Disclosure Sec. Litig., 980 F. Supp. 2d 564, 575 (S.D.N.Y. 2013), aff'd, 566 F. App'x 93 (2d Cir. 2014).

A.

The defendants argue that the plaintiffs have failed to plead any actionable misstatements related to Eletrobras's references to its Code of Ethics.  "[G]eneral statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery,' meaning that they are 'too general to cause a reasonable investor to rely upon them.'" City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG, 752 F.3d 173, 183 (2d Cir. 2014) (quoting ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 206 (2d Cir. 2009)). But "[t]his is not to say that statements about a company's

reputation for integrity or ethical conduct can never give rise to a securities violation." Ind. Pub. Ret. Sys. v. SAIC, Inc., 818 F.3d 85, 98 (2d Cir. 2016). "[F]or example, a company's specific statements that emphasize its reputation for integrity or ethical conduct as central to its financial condition or that are clearly designed to distinguish the company from other specified companies in the same industry" could "in some circumstances violate the securities laws." Id.

Here, Eletrobras initially emphasized its adherence to its Code of Ethics and corporate governance rules in response to specific press reports indicating that the Operation Car Wash money laundering investigation –– initially focused on energy company Petrobras –– had widened to include Eletrobras projects. See SAC ¶ 103. And as news continued to trickle out about further evidence implicating Eletrobras in the bribery and bid-rigging investigation, Eletrobras repeatedly emphasized and reasserted the strength of its internal controls and its commitment to transparency and ethical conduct.[6] See SAC ¶¶ 104-

---

[6] The statements responding to damaging reports also purported to reflect the Company's current state of affairs, stating that corporate governance rules "are observed by Eletrobras companies . . . including through [SPEs]," and that Eletrobras had "a governance system, management, and internal control[s] that are very strong." SAC ¶¶ 103, 133 (emphasis added). They are therefore distinguishable from the references to ethical standards in City of Pontiac, which appeared in offering materials and were "explicitly aspirational, with qualifiers such as 'aims to,' 'wants to,' and 'should.'" 752 F.3d at 183.

08.   The repeated references made specifically in response to damaging media reports about bribery and bid-rigging at Eletrobras were made to "emphasize its reputation for integrity or ethical conduct as central to its financial condition" and "clearly designed to distinguish [Eletrobras] from [Petrobras]" as news spread that the Operation Car Wash investigation had expanded to Eletrobras.   See SAIC Inc., 818 F.3d at 98.

Moreover, Eletrobras's repeated assertions about its strong ethical standards stand in stark contrast with the explanatory notes in its 2014 and 2015 annual reports, which confirm overpayments related to bribery and bid-rigging, a lack of effective internal controls over its corruption prevention program and monitoring of SPEs, criminal convictions and charges filed against former officers, and the implementation by the newly appointed board of directors and CEO of a new compliance program that seeks to "[d]evelop a new compliance-focused company culture."[7]   Campbell Decl. Ex. K at 1-5, Ex. L at 1-5.

"[W]hen (as here alleged) the statements were made repeatedly in an effort to reassure the investing public about

_____

[7] Eletrobras's attempt to distance itself from Petrobras, coupled with the clear differences between Eletrobras's original statements on ethical conduct and its subsequent disclosures admitting to bribery, bid-rigging, and criminal proceedings against former officers, make this case distinguishable from the general statements on ethical conduct deemed not actionable in Boca Raton Firefighters & Police Pension Fund v. Bahash, 506 F. App'x 32, 37 (2d Cir. 2012) (summary order) and In re Sanofi Sec. Litig., 155 F. Supp. 3d 386, 401-02 (S.D.N.Y. 2016).

the Company's integrity, a reasonable investor could rely on them as reflective of the true state of affairs at the Company." In re Petrobras Sec. Litig., 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015). Accordingly, there was a substantial likelihood that these statements, made to reassure investors, would be important to a reasonable person in considering whether to buy or sell shares of Eletrobras securities. See Operating Local 649, 595 F.3d 86 at 92-93. The plaintiffs have thus plausibly alleged material misstatements or omissions with respect to Eletrobras's repeated references to its ethics and integrity.

B.

The defendants argue that the plaintiffs have failed to plead any material misstatements regarding the Company's financial condition[8] as reflected in annual reports filed throughout the class period. The defendants focus primarily on the fact that the amount of illicit payments made since 2008 -- ultimately expensed in the 2014 and 2015 annual reports -- were not quantitatively material because the amounts represented only 0.20% of Eletrobras's 2014 total assets and .01% of 2015 total assets. However, the Second Circuit Court of Appeals has explained that courts must fully analyze "all relevant

_____

[8] The plaintiffs allege that the Company materially overstated PP&E, misstated earnings, understated and improperly accounted for certain expenses, failed timely to recognize losses from SPEs, and misrepresented or failed properly to disclose related-party transactions throughout the class period. See SAC ¶ 137.

21

considerations" when assessing materiality.  Litwin v.
Blackstone Grp., L.P., 634 F.3d 706, 717 (2d Cir. 2011);
Hutchison v. Deutsche Bank Sec. Inc., 647 F.3d 479, 485 (2d Cir.
2011).  Under the holistic analysis endorsed by the Court of
Appeals, sufficiently strong qualitative evidence of materiality
can establish materiality as a matter of law.  Litwin, 634 F.3d
at 717-18.  The qualitative inquiry is guided by SEC Staff
Accounting Bulletin No. 99 ("SAB 99"), 64 Fed. Reg. 45,150
(1999).  Id. at 717; see also In re New Oriental Educ. & Tech.
Grp. Sec. Litig., 988 F. Supp. 2d 406, 422-23 (S.D.N.Y. 2013).

SAB 99 provides a non-exhaustive list of the relevant
qualitative factors that could render material a quantitatively
small misstatement of a financial statement item.  See SAB 99, 64
Fed. Reg. at 45,152.  Such qualitative factors include whether
the misstatement involves concealment of an unlawful
transaction.  Id.; ECA, 553 F.3d at 198.

Although not cited by the plaintiffs, SAIC, Inc., is
particularly instructive in assessing materiality in this case.
There, two SAIC employees in charge of a contract with New York
City for timekeeping services became involved in an "elaborate
kickback scheme" with an outside contractor, in which the
contractor illegally paid the SAIC employees to hire the
contractor on behalf of SAIC, incur unnecessary costs from the
contractor's artificially inflated bills, and offload cost

overruns to the City.  See SAIC, Inc., 818 F.3d at 89.  As the
scheme unraveled, SAIC removed one of the employees and hired an
outside law firm to conduct an internal investigation of
possible fraud.  See id.  Meanwhile, SAIC "touted its commitment
to high standards of ethical performance and integrity," and it
was only after federal criminal charges were filed against the
SAIC employees and the outside contractor that SAIC disclosed to
investors the details of the kickback scheme.  See id. at 89-90
(internal quotation marks omitted).

The Second Circuit Court of Appeals rejected the
defendants' argument that the City project at issue was
immaterial due to a lack of quantitative materiality, because
such an approach would require the court to "consider
quantitative factors only in the narrowest light in determining
the financial impact of losing the [City project] due to the
fraud, and to otherwise ignore qualitative factors."  Id. at 96
(citing Litwin, 634 F.3d at 717-18).  Due to the "possible
exposure to significant civil and even criminal liability" and
the potential risks to future revenues, the court was "reluctant
to conclude . . . that the alleged misstatements were 'so
obviously unimportant' either quantitatively or qualitatively
that they could not be material."  SAIC, Inc., 818 F.3d at 96
(quoting ECA, 553 F.3d at 197).

Here, the 2014 and 2015 annual reports reveal that Eletrobras has been involved in illegal bribery and bid-rigging since at least 2008, and that the Company has been concealing these unlawful transactions by improperly capitalizing illicit payments as PP&E and failing to write off illicit payments paid by SPEs. See Campbell Decl. Ex. K at 2, Ex. L at 2. And beyond just the "possible exposure to significant civil and even criminal liability," SAIC, Inc., 818 F.3d at 96, the Company has now disclosed that a former officer of a wholly owned Eletrobras subsidiary was sentenced to more than four decades in prison for passive bribery, money laundering, obstruction of justice, tax evasion, and participation in a criminal organization, with other former officers being charged on similar grounds. See Campbell Decl. Ex. K at 2, Ex. L at 2. The 2014 and 2015 annual reports further disclose that the entire board of directors and CEO have been replaced, and that a new compliance program has been launched. See id.

Plainly, the fact that some of Eletrobras's officers have been engaged in conduct since 2008 that resulted in serious criminal consequences, an overhaul of Eletrobras's corporate governance system, and the replacement of board of directors and management is not "so obviously unimportant to a reasonable investor" to be immaterial. ECA, 553 F.3d at 197; see also Petrobras, 116 F. Supp. 3d at 380 ("The errors in [the

24

Company's] financial statements were directly related to its concealment of the unlawful bribery scheme, revelation of which would 'call into question the integrity of the company as a whole.'" (quoting Strougo v. Barclays PLC, 105 F. Supp. 3d 330, 349 (S.D.N.Y. 2015))).

Aside from Eletrobras's concealment of unlawful transactions, other SAB 99 factors weigh against concluding at this stage that Eletrobras's alleged misstatements and omissions regarding illicit payments were not material as a matter of law. For example, the 2014 annual report reveals that all amounts of illicit payments made for the acquisition of PP&E from 2008 through 2014 were expensed in the 2014 annual report.  See Campbell Decl. Ex. K at 3.  In other words, prior annual reports understated expenses and overstated earnings, thereby implicating whether such misstatements in the previous annual reports "mask[ed] a change in earnings or other trends" or "change[d] a loss into income or vice versa."  SAB 99, 64 Fed. Reg. at 45,152.

SAB 99 also states that in assessing materiality, whether management expects that a "known misstatement may result in a significant positive or negative market reaction, that expected reaction should be taken into account when considering whether a misstatement is material."  Id.  Here, the plaintiffs describe in detail Eletrobras management's responses to allegations of

bribery and bid-rigging that arose after the Operation Car Wash investigation unfolded, as well as corresponding market reactions in the value of Eletrobras ADSs.  See SAC ¶¶ 267, 268, 271-88.  While "market volatility alone is 'too blunt an instrument to be depended on in considering whether a fact is material,'" ECA, 553 F.3d at 205 (quoting SAB 99, 64 Fed. Reg. at 45,152), the significant volatility of Eletrobras ADSs, considered in aggregate with other SAB 99 factors[9], preclude the conclusion that the alleged misstatements and omissions related

---

[9] Other SAB 99 factors further indicate that the plaintiffs at this stage have adequately pleaded material misstatements or omissions in Eletrobras's financial condition.

One relevant factor is "[w]hether the misstatement arises from an item capable of precise measurement or whether it arises from an estimate and if so, the degree of imprecision inherent in the estimate," SAB 99, 64 Fed. Reg. at 45,152, and the 2014 and 2015 annual reports emphasize the uncertain nature of the amounts of illicit payments because "[t]he information to determine the amount by which the Company was potentially overcharged by . . .  contractors and suppliers is not contained within the Company's accounting records or internal control systems."  Campbell Decl. Ex. K at 3, Ex. L at 3.

Another relevant factor is the "significance of the misstatement in relation to the company's operations." ECA, 553 F.3d at 198; Hutchison, 647 F.3d at 488 ("If a particular product or productline, or division or segment of a company's business, has independent significance for investors, then even a matter material to less than all of the company's business may be material for purposes of the securities laws."); SAB 99, 64 Fed. Reg. at 45,152 ("Whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability.").  Here, the alleged misstatements related to the value of Eletrobras's electricity-producing infrastructure, which is at the heart of Eletrobras's business.  See Petrobras, 116 F. Supp. 3d at 380 ("[T]he misstatements related to the value of Petrobras' oil-producing infrastructure, which is the core of its business.")

to the bribery scheme in previous annual reports were "so obviously unimportant to a reasonable investor" to be immaterial.  ECA, 553 F.3d at 197; see also Petrobras, 116 F. Supp. 3d at 380 ("[P]laintiffs allege that [the Company's] share price dropped dramatically when news of the corruption emerged, indicating that investors did, in fact, consider that information to be material.").  Accordingly, the plaintiffs have plausibly alleged that the annual reports disclosing the financial condition of the Company during the class period contained material misstatements or omissions.[10]

C.

The defendants argue that the plaintiffs have not alleged facts sufficient to support a strong inference of scienter.  The scienter required to support a securities fraud claim can be "intent to deceive, manipulate, or defraud, or at least knowing

---

[10] The plaintiffs also allege that the Company materially misrepresented or failed to disclose the true extent of its internal control problems throughout the class period.  However, the allegations within the SAC indicate that Eletrobras recognized numerous material weaknesses with respect to its internal controls throughout the class period.  SAC ¶¶ 112, 113, 117-134. While these allegations provide further support to infer scienter, they are not sufficiently particularized to form a basis for material misrepresentations.  In re Magnum Hunter Res. Corp. Sec. Litig., 26 F. Supp. 3d 278, 295 (S.D.N.Y. 2014), aff'd, 616 F. App'x 442 (2d Cir. 2015) ("The fact that defendants recognized problems, announced that they were implementing effective controls and procedures, and then recognized more problems does not indicate that their statements were false at the time that they were made.").

misconduct." SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1467 (2d Cir. 1996) (internal citations omitted).  The PSLRA requires that a complaint alleging securities fraud "state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  Scienter may be inferred from (i) facts showing that a defendant had "both motive and opportunity to commit the fraud," or (ii) facts that constitute "strong circumstantial evidence of conscious misbehavior or recklessness."  ATSI, 493 F.3d at 99; see also City of Roseville, 814 F. Supp. 2d at 418-19.

In order to plead scienter adequately, the plaintiffs must allege facts supporting a strong inference with respect to each defendant.  See Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v. Arbitron Inc., 741 F. Supp. 2d 474, 488 (S.D.N.Y. 2010).  "[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences."  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 323 (2007).  A complaint sufficiently alleges scienter when "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  Id. at 324; see also Slayton v. Am. Express Co., 604 F.3d 758, 766 (2d Cir. 2010).

In this case, the plaintiffs do not attempt to allege scienter by showing that the defendants had a "motive and opportunity" to commit fraud, relying instead on the defendants' alleged "conscious misbehavior or recklessness." Where the defendants' motive to commit fraud is not apparent, "the strength of the circumstantial allegations [that a defendant consciously or recklessly misbehaved] must be correspondingly greater." Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001). Plaintiffs typically allege conscious or reckless misbehavior by pleading with specificity that the defendants had "knowledge of facts or access to information contradicting their public statements." Novak v. Kasaks, 216 F.3d 300, 308 (2d Cir. 2000).

As the Second Circuit Court of Appeals has explained, "[r]eckless conduct is, at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Chill v. Gen. Elec. Co., 101 F.3d 263, 269 (2d Cir. 1996) (alterations in original); Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 194 (2d Cir. 2008) (noting a strong inference of scienter through recklessness may arise where the complaint sufficiently alleges that the defendants "knew facts or had access to information suggesting that their public

statements were not accurate; or . . . failed to check information they had a duty to monitor" (quoting Novak, 216 F.3d at 311)); see also Orthofix, 89 F. Supp. 3d at 614.

1.

The plaintiffs have failed to raise a strong inference of scienter with respect to Lopes.  The only facts specifically alleged against Lopes were that he was Eletrobras's Chairman and CEO for six months from the start of the class period on August 17, 2010, until his transition to Chief Transmission Officer in February 2011, that he signed the Code of Ethics, and that from at least 2013 through 2015, he was the Chairman of the board of an Eletrobras subsidiary that owned a minority stake in the SPE responsible for the Belo Monte hydroelectric dam, one of the projects subject to Eletrobras's internal investigation.  SAC ¶¶ 17, 30, 237.  These are merely "general allegations regarding . . . the organizational role of a defendant" that "by themselves . . . are insufficient to raise a strong inference of a defendant's scienter."  In re Marsh & Mclennan Cos., Inc. Sec. Litig., 501 F. Supp. 2d 452, 483 (S.D.N.Y. 2006) (collecting cases).  Moreover, the only public statement that plaintiffs allege Lopes made was that he signed the Code of Ethics, and they fail to plead with particularity any allegations indicating that Lopes had "knowledge of facts or access to information contradicting [his] public statements."  Novak, 216 F.3d at 308.

Accordingly, the motion by Lopes to dismiss the plaintiffs'
claim against him in Count One for violations of Section 10(b)
and Rule 10b-5 is **granted.**

2.

The allegations against Carvalho and Araújo are
significantly more particularized than the allegations against
Lopes.  Both Carvalho, who replaced Lopes as CEO and as a member
of Eletrobras's board of directors in February 2011, and Araújo,
Eletrobras's CFO and Head of Investor Relations throughout the
class period, signed the annual reports released throughout the
class period, as well as the corresponding SOX certifications
indicating that both had designed, established, and maintained
internal controls related to disclosure.  SAC ¶¶ 31-32; 114.
Each annual report indicated numerous material weaknesses in
internal controls, SAC ¶¶ 111-19, including some that disclosed
deficient controls "with respect to accounting for property,
plant and equipment, specifically, to ensure the completeness,
accuracy and validation of these acquisitions," as well as
deficient controls related to the impairment calculation of
assets.  SAC ¶¶ 120; 125.

The plaintiffs further allege that Eletrobras's internal
audit unit conducted two audits during the class period that
indicated significant problems with a lack of controls at
Eletrobras SPEs -- including the lack of any requirement that

31

SPE partners execute anticorruption declarations attesting to no knowledge of unlawful business activities statements. SAC ¶¶ 248-49.  These audits culminated in an internal report, circulated to the board of directors including Carvalho, concluding that with respect to SPEs, "corporate management is a black hole and that the company lacks controls to approve their accounts."  Id.

Despite these problems, Carvalho and Araújo signed the relevant annual reports, which stated that the financial statements were fairly presented in all material respects. See SAC ¶¶ 113, 122, 127, 132.  And as news reports implicating Eletrobras emerged, Carvalho stated that Eletrobras had a "governance system, management, and internal control[s] that are very strong," SAC ¶ 133, while Araújo signed a 6-K stating that "the Company, through its internal controls and compliance program, did not identify the existence of any episode of fraud and corruption in its projects."  SAC ¶ 106.

These red flags highlighted significant problems with Eletrobras's internal controls -- including those in PP&E and investments in SPEs that were ultimately subject to write-offs due to illicit payments -- and therefore support a strong inference that Carvalho and Araújo acted with scienter.  See Dobina v. Weatherford Int'l Ltd., 909 F. Supp. 2d 228, 247-48 (S.D.N.Y. 2012) (noting that control deficiencies can support a

strong inference of individual scienter); <u>Varghese v. China Shenghuo Pharm. Holdings, Inc.</u>, 672 F. Supp. 2d 596, 608 (S.D.N.Y. 2009); <u>In re Veeco Instruments, Inc. Sec. Litig.</u>, 235 F.R.D. 220, 232 (S.D.N.Y. 2006) ("[A] failure to maintain sufficient internal controls to avoid fraud is sufficiently indicative of scienter."); <u>see also</u> <u>In re Marsh & Mclennan Cos.</u>, 501 F. Supp. 2d at 486 (determining that, after the announcement of a government investigation of misconduct at subsidiary, an executive's personal comments aggressively supporting company's business practices, combined with the rapid discovery of misconduct at subsidiary thereafter, constituted strong circumstantial evidence of the executive's scienter).

Carvalho and Araújo's positions within the Company and its subsidiaries further bolster the circumstantial evidence supporting an inference of scienter. Eletrobras CEO and director Carvalho was also the chairman of the board of the Eletrobras subsidiary since February of 2011 through the end of the class period that owned 100% of the Simplício hydroelectric plant that was subject to write offs due to illicit payments and also had minority interests either directly or through SPEs in three other projects subject to Eletrobras's internal investigation.[11]  SAC ¶ 237.  CFO Araújo was also chairman of the

---

[11] Whether illicit payments were made in relation to these projects is still unclear; the 2014 and 2015 annual reports

board of another Eletrobras subsidiary that owned minority interests in the SPEs responsible for two projects subject to Eletrobras's internal investigation.  SAC ¶ 237.  And both Carvalho and Araújo were senior executives at a company in which one former officer has been sentenced to 43 years in prison for passive bribery, money laundering, obstruction of justice, tax evasion and participation in a criminal organization, with other former officers formally charged with corruption, money laundering and obstruction of justice.

In sum, Carvalho and Araújo held senior executive positions at Eletrobras, governance positions in subsidiaries with affiliations with projects subject to write-offs or investigations, and were allegedly aware of material weaknesses in internal controls at Eletrobras.  As such, there is a strong inference that both Carvalho and Araújo "knew facts or had access to information suggesting that their public statements were not accurate" or "failed to check information they had a duty to monitor." Dynex Capital, 531 F.3d at 194.

Finally, the 2014 and 2015 annual reports disclose that since the start of Eletrobras's internal investigation, Carvalho

---

reveal that the Company recognized a loss in its equity method investments related to SPEs not controlled by the Company, but they do not provide a list of specific SPE-owned projects that were subject to write-offs due to illicit payments.  See Campbell Decl. Ex. K at 1-5, Ex. L at 1-5.

has been replaced as Eletrobras's CEO,[12] and "the timing and circumstances of individual defendants' resignations may add some further weight to an overall inference of scienter." Orthofix, 89 F. Supp. 3d at 619.

In light of the foregoing, a reasonable person would deem an inference of scienter for defendants Carvalho and Araújo "at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, 551 U.S. at 324.

Accordingly, the motion by Carvalho and Araújo to dismiss the plaintiffs' claims against them in Count One for violations of Section 10(b) and Rule 10b-5 is **denied.**

3.

Eletrobras moves to dismiss the plaintiffs' Section 10(b) and Rule 10b-5(b) claim as against it, arguing that the plaintiffs have failed to plead scienter by the Company.  But because the SAC properly alleges scienter against two key officers of Eletrobras, it necessarily alleges scienter against

---

[12] The defendants attempt to argue that the replacement of Carvalho as CEO, and indeed the replacement of its entire board of directors, was an ordinary part of the political cycle in Brazil and does not raise an inference that the changes were related to Operation Car Wash or the results of the internal investigation.  But Eletrobras's disclosure regarding executive turnover appears in the explanatory note, which focuses exclusively on issues related to Operation Car Wash and the internal investigation. See Campbell Decl. Ex. K at 1-5, Ex. L at 1-5.  The clear implication of the disclosure and its placement in this explanatory note is that the CEO and board were replaced, at least in part, because of the findings of Operation Car Wash and the internal investigation.

Eletrobras itself.[13] See <u>Dynex Capital</u>, 531 F.3d at 195 ("In most cases, the most straightforward way to raise [an inference of scienter] for a corporate defendant will be to plead it for an individual defendant."); <u>Arbitron</u>, 741 F. Supp. 2d at 491 ("Because the plaintiffs have successfully pleaded scienter as to . . . Arbitron's then-president, CEO, and chairman, they have also pleaded corporate scienter as to Arbitron."); see also <u>In re Marsh & Mclennan Cos.</u>, 501 F. Supp. 2d at 483 ("There are sufficient allegations regarding the pervasiveness of the fraud, the conscious misbehavior of particular corporate employees, and the complicity of the corporate entities to find that [the parent company] was aware of or recklessly disregarded the intentional misconduct at [subsidiary]."); <u>Orthofix</u>, 89 F. Supp. 3d at 619-20.  Accordingly, Eletrobras's motion to dismiss the plaintiffs' claim against it in Count One for violations of Section 10(b) and Rule 10b-5 is **denied.**

V.

In Count Two, the plaintiffs allege that all defendants are liable under a "scheme liability" theory pursuant to subsections (a) and (c) of Rule 10b-5, which states:

---

[13] Because the plaintiffs have adequately raised an inference of scienter with respect to Carvalho and Araújo that can therefore be imputed to Eletrobras, the Court need not address whether the intent of the Company's other officers may be imputed to Eletrobras.

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, [or] ... (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5(a), (c).

"To state a claim for scheme liability, a plaintiff must present facts showing '(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance.'" Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC, 164 F. Supp. 3d 568, 577 (S.D.N.Y. 2016) (quoting In re Alstom SA Sec. Litig., 406 F. Supp. 2d 433, 474 (S.D.N.Y. 2005). "Scheme liability under subsections (a) and (c) of Rule 10b–5 hinges on the performance of an inherently deceptive act that is distinct from an alleged misstatement." S.E.C. v. Kelly, 817 F. Supp. 2d 340, 344 (S.D.N.Y. 2011); see also Lentell v. Merrill Lynch & Co. Inc., 396 F.3d 161, 177 (2d Cir. 2005) (denying a market manipulation claim under 10b–5(a) and (c) because the plaintiffs' "sole basis for such claims is alleged misrepresentations or omissions"). "[T]he three subsections of Rule 10b–5 are distinct, and courts must scrutinize pleadings to ensure that misrepresentation or omission claims do not proceed under the scheme liability

37

rubric." In re Smith Barney Transfer Agent Litig., 884 F. Supp.
2d 152, 161 (S.D.N.Y. 2012); see S.E.C. v. China Ne. Petroleum
Holdings Ltd., 27 F. Supp. 3d 379, 391–92 (S.D.N.Y. 2014)
("[T]he SEC has competently pled the existence of a larger
scheme, one that went beyond mere misrepresentations to
investors, whereby defendants enriched themselves and their
families at shareholders' expense.").

Generally, plaintiffs may raise a strong inference of a
corporate entity defendant's scienter by pleading the necessary
facts against an individual corporate officer whose intent can
be imputed to the corporate entity. See Dynex Capital, 531 F.3d
at 195. However, under the "adverse interest" exception, an
individual corporate officer's scienter may not be imputed to
the corporate entity defendant "if the officer acted entirely in
his own interests and adversely to the interests of the
corporation." In re CBI Holding Co., 529 F.3d 432, 448 (2d Cir.
2008) (emphasis added); see Petrobras, 116 F. Supp. 3d at 382;
see also Kirschner v. KPMG LLP, 938 N.E.2d 941, 952 (N.Y. 2010)
(emphasizing the "narrow scope" of the adverse interest
exception, which requires that the individual agent "must have
totally abandoned his principal's interests and be acting
entirely for his own or another's purposes," and noting that the
exception is inapplicable if "there is a benefit to both the

insider and the corporation" (quotations mark and citation omitted)).

"Reliance by the plaintiff upon the defendant's deceptive acts is an essential element" of a private cause of action alleging scheme liability under subsections (a) and (c) of Rule 10b-5. Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, 552 U.S. 148, 152-53, 159, 160-61 (2008) (denying a scheme liability claim against "entities who, acting both as customers and suppliers, agreed to arrangements that allowed the investors' company to mislead its auditor and issue a misleading financial statement" because the entities' "deceptive acts . . . [were] too remote to satisfy the requirement of reliance" and "nothing [the entities] did made it necessary or inevitable for [the Company] to record the transactions as it did").

Here, the plaintiffs allege that all defendants are liable for scheme liability claims under Rule 10b-5(a) and (c). But the plaintiffs do not adequately allege that Lopes, Carvalho, and Araújo actively participated in any bribery or bid-rigging scheme.  Instead, the plaintiffs focus only on these defendants' alleged misstatements or omissions, and therefore fail to state that they committed an "inherently deceptive act that is distinct from an alleged misstatement." Kelly, 817 F. Supp. 2d at 344; see also In re Smith Barney Transfer Agent Litig., 884 F. Supp. 2d at 161.  Accordingly, the plaintiffs have failed

39

adequately to plead scheme liability claims against Lopes, Carvalho, and Araújo.

As to the defendant Eletrobras, the plaintiffs claim that the Company should be liable under Rule 10b-5(a) and (c) because of the actions of Chief Generation Officer Cardeal, who, according to the plaintiffs, undertook a deceptive scheme and course of conduct beyond mere misrepresentations by actively participating in the bribery and bid-rigging scheme.

The defendants do not appear to dispute that Cardeal allegedly committed a deceptive or manipulative act in furtherance of an alleged scheme to defraud.  Instead, they argue that Cardeal's scienter cannot be imputed to Eletrobras under the adverse interest exception.

The defendants' argument is without merit.  According to the plaintiffs, Chief Generation Officer Cardeal helped award the Angra 3 project to certain contractors and subsequently ordered those contractors to re-direct Eletrobras payments to political officials as kickbacks.  See SAC ¶ 241.  The plaintiffs further allege that one of the political officials who received illicit payments was the head of the Brazilian government's primary regulator of the power industry.  See SAC ¶ 13.  Thus, Eletrobras likely benefitted at least in part from the alleged deceptive scheme by receiving the political advantages derived from such illicit payments.  See Petrobras,

116 F. Supp. 3d at 382 ("[I]t is reasonable to infer that the
Company benefited from remaining in favor with its political
patrons."). And Eletrobras further benefitted from the scheme
by including such payments as part of the Company's PP&E,
despite the fact that such amounts "should not have been
capitalized" according to the Company's own 2014 and 2015 annual
reports. Campbell Decl. Ex. K at 2, Ex. L at 2; see Petrobras,
116 F. Supp. 3d at 382 ("[T]he value of Petrobras' PP&E appeared
to be higher than it actually was, which in turn inflated the
value of Petrobras' securities. Thus, the inflation of the
Company's PP&E operated as a fraud on the investing public, not
on Petrobras itself."). Cardeal's alleged acts were not
"entirely in his own interests and adverse[] to the interests of
the corporation." In re CBI Holding Co., 529 F.3d at 448.
Accordingly, as it relates to the plaintiffs' scheme liability
claims, Cardeal's scienter may be imputed to Eletrobras.

The defendants further argue that the scheme liability
claim against Eletrobras should be dismissed because the
plaintiffs cannot establish that they relied on Cardeal's
deceptive acts. However, the plaintiffs allege that Chief
Generation Officer Cardeal organized an illegal kickback scheme
with contractors that resulted in misleadingly overstated PP&E,
attempted to collude with Eletronuclear's former CEO to cover up
and deny allegations of bribery, and met personally on two

41

occasions with contractors who have admitted to paying bribes in connection with another Eletrobras project. See SAC ¶¶ 12, 14, 20, 33, 46B, 54B, 241-42, 250, 254, 287.  The plaintiffs have therefore adequately pleaded scheme liability reliance because Cardeal's alleged participation in this deceptive scheme made it "necessary or inevitable" that falsehoods on the part of Eletrobras would result.  See Stoneridge, 552 U.S. at 161; In re Bristol Myers Squibb Co., 586 F. Supp. 2d at 170.[14]

Based on the foregoing, the defendants' motion to dismiss the plaintiffs' scheme liability claims in Count Two pursuant to Rule 10b-5(a) and (c) against Lopes, Carvalho, and Araújo is **granted.**  However, the plaintiffs have pleaded factual allegations sufficient to support a scheme liability claim under Rule 10b-5(a) and (c) against Eletrobras based on the alleged conduct of Cardeal.  The motion to dismiss the plaintiffs'

---

[14] The defendants attempt to rely on Pacific Investment Management Company LLC v. Mayer Brown LLP ("PIMCO"), 603 F.3d 144, 159 (2d Cir. 2010) to claim that the plaintiffs cannot establish reliance here.  But PIMCO addressed scheme liability for "secondary actors," in other words "lawyers[,] accountants, or other parties who are not employed by the issuing firm whose securities are the subject of allegations of fraud."  603 F.3d at 148 n.1 (emphasis added).  Because Cardeal's alleged participation in the deceptive scheme was in his role as an officer of Eletrobras and not as a secondary actor, PIMCO is inapposite here.  Moreover, pursuant to the bribery scheme and its cover-up, the financial statements of Eletrobras were allegedly misstated and the plaintiffs allegedly relied on that deceptive conduct by Eletrobras.

scheme liability claim in Count Two against Eletrobras is
therefore **denied.**[15]

VI.

In Count Three, the plaintiffs allege that the individual
defendants are liable under Section 20(a) of the Exchange Act
because they controlled Eletrobras, which in turn violated
Section 10(b) and Rule 10b-5.  Section 20(a) provides:

> Every person who, directly or indirectly,
> controls any person liable under any
> provision of this chapter or of any rule or
> regulation thereunder shall also be liable
> jointly and severally with and to the same
> extent as such controlled person to any
> person to whom such controlled person is
> liable . . . unless the controlling person
> acted in good faith and did not directly or
> indirectly induce the act or acts
> constituting the violation or cause of
> action.

15 U.S.C. § 78t(a).  "To establish a prima facie case of control
person liability, a plaintiff must show (1) a primary violation
by the controlled person, (2) control of the primary violator by
the defendant, and (3) that the defendant was, in some
meaningful sense, a culpable participant in the controlled
person's fraud."  <u>ATSI</u>, 493 F.3d at 108; <u>see also</u> <u>Orthofix</u>, 89
F. Supp. 3d at 621.  The individual defendants argue that they
are not liable under Section 20(a), first, because Eletrobras

---

[15] There is no motion to dismiss the scheme liability claims
against Cardeal because the summons and SAC have not yet been
served on him.

did not violate Section 10(b) and Rule 10b-5, and second, because none of the individual defendants were culpable participants in Eletrobras's alleged fraud.  The first argument fails because, as discussed above, there are sufficient allegations of Eletrobras's liability.  Similarly, with respect to the second argument, there are sufficient allegations as to the culpable participation of Carvalho and Araújo.  However, there are insufficient allegations concerning the culpable participation of defendant Lopes.  Therefore, while the motion to dismiss the Section 20(a) claims is **granted** with respect to Lopes, it is **denied** with respect to Carvalho and Araújo.[16]

CONCLUSION

The Court has considered all of the remaining arguments of the parties. To the extent not specifically addressed above, they are either moot or without merit. For the foregoing reasons, the defendants' motion to dismiss is **granted in part and denied in part.**  All claims against the defendant Lopes are **dismissed**.  The scheme liability claims under Rule 10b-5(a) and (c) against the defendants Carvalho and Araújo are also **dismissed.** The motion to dismiss is otherwise **denied.   The Clerk**

---

[16] The Section 20(a) claim against Cardeal survives because this motion to dismiss was brought only on behalf of Eletrobras, Lopes, Carvalho, and Araújo.

44

is directed to close all pending motions.


SO ORDERED.

Dated:     New York, New York
           March 25, 2017             _____/s/_____
                                             John G. Koeltl
                                      United States District Judge